T.C. Memo. 2006-16

UNITED STATES TAX COURT

HOWARD J. KAPLAN AND BRENDA L. KAPLAN, ET AL.,[1] Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 20716-03, 20717-03,      Filed February 2, 2006.
            20718-03.

Thomas F. Foster, Robert A. Brinson, and Christopher C.

Finan, for petitioners.

James R. Rich, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge:  Respondent determined for the taxable year

---

[1]Cases of the following petitioners are consolidated here-
with:  Matthew B. Marceron and Sherry R. Marceron, docket No.
20717-03, and Dean A. Caldwell and Cathy M. Caldwell, docket No.
20718-03.

1999 the following deficiency in, and accuracy-related penalty under section 6662(a)[2] on, the Federal income tax (tax) of petitioners in each of these consolidated cases:

| Petitioners | Deficiency | Accuracy-Related Penalty |
|---|---|---|
| Howard J. Kaplan and Brenda L. Kaplan | $252,728 | $91,714 |
| Matthew B. Marceron and Sherry R. Marceron | 18,169 | 6,839 |
| Dean A. Caldwell and Cathy M. Caldwell | 137,931 | 49,736 |

The issues remaining for decision are:

(1) Are petitioners in each of these cases entitled for 1999 to a deduction under section 170(a) for a claimed noncash charitable contribution?  We hold that they are not.

(2) Are petitioners in each of these cases liable for 1999 for the accuracy-related penalty under section 6662(a)?  We hold that they are.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time they filed their respective petitions, Howard J. Kaplan (Mr. Kaplan) and Brenda L. Kaplan (Ms. Kaplan) resided in Winston-Salem, North Carolina, Matthew B. Marceron (Mr. Marceron) and Sherry R. Marceron (Ms. Marceron) resided in Clemmons, North Carolina, and Dean A. Caldwell (Mr. Caldwell) and Cathy M.

---

[2]All section references are to the Internal Revenue Code in effect for the year at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

Caldwell (Ms. Caldwell) resided in Winston-Salem, North Carolina.

In January 1995, KQC Investors, LLC (KQC), a limited liability company organized under North Carolina law, was formed to acquire and develop real property, primarily for lease to early childhood educational agencies, including Federal Head Start (Head Start) agencies. During 1999, Mr. Kaplan, Mr. Marceron, and Mr. Caldwell, the three members of KQC, held the following percentage interests in that limited liability company:

| Name of member | Percentage interest |
|----------------|---------------------|
| Mr. Kaplan | 59.4 |
| Mr. Marceron | 5 |
| Mr. Caldwell | 35.6 |

In 1997, KQC purchased for $105,041 real property located at 474 Maple Street, Helena, Ohio (Maple Street), which consisted of approximately 2.04 acres of land (KQC's land) on which there was a school building that was constructed in 1958 and remodeled in 1994 (1958 school building). (We shall sometimes refer to (1) the property on Maple Street that KQC purchased in 1997 as KQC's land and 1958 school building and (2) the property on Maple Street that KQC purchased in 1997, including any improvements made to that property thereafter (discussed below), as the improved property on Maple Street.) On April 18, 1997, a general warranty deed (April 18, 1997 general warranty deed) was executed that transferred to KQC KQC's land and 1958 school building that KQC purchased in 1997.

On or about April 21, 1997, KQC leased KQC's land and 1958 school building to Texas Migrant Council, Inc. (TMC), an organization described in sections 170(c) and 501(c) that provided Head Start services to migrant families in communities throughout, inter alia, Ohio. TMC intended to, and did, use KQC's land and 1958 school building that it leased from KQC in order to conduct Head Start activities in Helena, Ohio.

The lease of KQC's land and 1958 school building by KQC to TMC (April 21, 1997 lease) provided in pertinent part:

> WHEREAS, Lessor [KQC] plans to purchase a 6,100 square foot child care facility located in * * * Helena, * * * Ohio on the property more particularly described on **Exhibit A**[3] (the "Facility");
>
> \*      \*      \*      \*      \*      \*      \*
>
> WHEREAS, Lessee [TMC] is an agency of and regulated by the United States Department of Health and Human Services ("HHS");
>
> NOW, THEREFORE, in consideration of the premises and of their mutual undertakings, the parties hereto agree as follows:
>
> 1. Lease of Real Property; Term: Lessor, in consideration of the rents hereinafter reserved, and the terms, covenants, conditions and agreements set forth herein to be kept and performed by Lessee, does hereby agree to demise and let unto Lessee and Lessee does hereby agree to hire and take from Lessor, the following described assets, rights, interests and other properties owned by Lessor and relating to the Facility (herein the "Demised Premises"):

---

[3]The description of the property in Exhibit A attached to the April 21, 1997 lease is virtually the same as the description of the property set forth in the April 18, 1997 general warranty deed.

(a) <u>Land</u>: The parcel of land more particularly described on **Exhibit A** (herein the "Parcel");

(b) <u>Improvements</u>: All buildings, structures, fixtures and improvements erected or located on the Parcel, or affixed thereto (herein the "Improvements");

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

TO HAVE AND TO HOLD the Demised Premises unto Lessee, its successors and permitted assigns, upon and subject to all of the terms, covenants, conditions, conditional limitations and agreements herein contained, for a term commencing on April 21, 1997 (herein the "Commencement Date") and expiring twenty (20) years later, or until said term is sooner terminated pursuant to any of the conditional limitations or other provisions hereof (herein the "Primary Term"). For purposes hereof, the Term "Lease Year" means a period of one (1) year commencing on the Commencement Date or the annual anniversary date thereof.

The Lessee shall have the right to extend the Primary Term for an additional two (2) five (5) year periods (the "Additional Terms"; the Primary Term and any Additional Terms, hereafter, the "Term"). The Lessee must exercise said option to extend in writing no later than six (6) months prior to the expiration of the Primary Term or Additional Terms * * *.

2. <u>Title to Demised Premises</u>. The Demised Premises shall be demised and let by Lessor unto Lessee free and clear of any and all liens, leases, mortgages, pledges, security interests, conditional sale agreements, charges, claims, options, and other encumbrances of any kind or nature whatsoever (collectively "Encumbrances"), except the following (collectively the "Permitted Encumbrances"):

(a) <u>Zoning Laws</u>: The provisions of all applicable zoning laws;

(b) <u>Taxes</u>: The liens of current real estate and personal property taxes not delinquent; and

(c) <u>Other Existing Encumbrances</u>:  The other existing Encumbrances set forth on **Exhibit B**.

3.    <u>Rent</u>.  The Lessee shall pay to Lessor rent for the Demised Premises * * * in an amount of One Thousand Six Hundred and no/100 Dollars ($1,600.00) for each month of the Term * * *.  It is understood that non-federal funds acquired by Lessee cannot be used to make rental payments if funds from HHS are terminated.

  *       *       *       *       *       *       *

5.    <u>Mortgages</u>.  Lessor has or may subject its interests in the Demised Premises to liens of mortgages thereon, and this Lease shall be subordinate to any mortgage on Lessor's interest in the Demised Premises (the "Fee Mortgage"). * * *

6.    <u>Taxes and Utilities</u>.  Lessee shall, at its cost and expense, bear, pay and discharge, on or before the last day upon which the same may be paid without interest or penalty for late payment thereof, all personal property taxes, assessments, sewer rents, water rents and charges, duties, impositions, license and permit fees, charges for public utilities of any kind, payments and other charges of every kind or nature whatsoever, ordinary or extraordinary, foreseen or unforeseen, general or special (collectively herein "Impositions") * * *.

The foregoing notwithstanding, the parties agree that the Lessor shall be responsible, and shall pay when due, all real property ad valorem taxes which may be assessed against the Demised Premises (the "Taxes"). The Lessee agrees to reimburse the Lessor, on an annual or semi-annual basis, for the amount of such ad valorem property taxes due for the Demised Premises. * * *

  *       *       *       *       *       *       *

7.    <u>Asbestos Removal, Facility Repair and Re-placement</u>.

  *       *       *       *       *       *       *

(b) <u>Repairs and Replacement</u>:  Lessee accepts the Demised Premises from Lessor in "as is" condition and Lessor shall not be required to make any

improvements, replacements, or repairs of any kind or character to the Demised Premises during the Term of this Lease. Lessee shall at all times during the Term hereof, at its own cost and expense, keep the Demised Premises in good and reasonable operating condition and repair, and in such condition as may be required by law and by the terms of the insurance policies furnished pursuant to the terms of this Lease, specifically including, but not limited to, the replacement of any Tangibles which may be required by law or regulations or which may have become worn or obsolete, whether or not such repairs or replacements shall be structural or nonstructural, interior or exterior, extraordinary or ordinary, and whether or not the same can be said to be within the present contemplation of the parties hereto. All such repairs or replacements shall be performed by duly licensed contractors reasonably acceptable to Lessor and in a manner reasonably acceptable to Lessor.

\* \* \* \* \* \* \*

(d) <u>Road Maintenance</u>: Lessee acknowledges that access to the Demised Premises is by an easement to a road which is more commonly referred to as "Maple Street." Lessee shall be solely responsible for any costs incurred by or imposed on Lessor for the maintenance of such road.

\* \* \* \* \* \* \*

9. <u>Alterations</u>. Lessee shall not make any alterations or additions to the Demised Premises without Lessor's prior approval, which approval may be withheld in Lessor's sole and absolute discretion. Any mechanic's lien filed against the Demised Premises for work or materials claimed to have been furnished to Lessee shall be discharged of record by Lessee within ten (10) days thereafter, at Lessee's expense \* \* \*.

10. <u>Use of Demised Premises</u>. Lessee shall use and occupy the Demised Premises solely for operation as a child day care facility. Lessee agrees that the Lessor, and its duly designated representatives, shall have the right, but not the obligation, to review, from time to time, the method and nature of the Lessee's

operation of the Facility. It is Lessee's obligation to operate the Facility in a quality manner and as a "first class" day care facility. Failure of the Lessee to do so, as reasonably determined by the Lessor or its duly designated representatives, shall constitute an event of default under this Lease. The Lessee agrees to provide access to the Demised Premises to duly authorized representatives of the Lessor. * * *

*       *       *       *       *       *       *

11. <u>Net Lease</u>. This is an absolute net lease and Lessor shall not be required to provide any services or do any act or thing with respect to the Demised Premises and the rent reserved herein shall be paid to Lessor without any claim on the part of Lessee for diminution, setoff or abatement, and nothing shall suspend, abate or reduce any rent to be paid hereunder except as otherwise specifically provided herein.

12. <u>Insurance</u>.

(a) <u>Liability Insurance</u>. At all times during the Term hereof, Lessee shall, at its own cost and expense, provide and keep in force liability insurance policies as follows:

(1) Commercial general liability insurance including, without limitation upon the generality of the provisions of this paragraph protecting Lessor and Lessee against accident or disaster in or about the Demised Premises with limits not less than Two Million Dollars ($2,000,000.00) combined single limit for bodily injury (including death) and one Million Dollars ($1,000,000.00) for property damage;

(2) Excess liability coverage of One Million Dollars ($1,000,000.00);

(3) Professional liability insurance, with limits not less than One Million Dollars ($1,000,000.00) including sexual molestation and abuse coverage; and

(4) Workers' compensation insurance, with limits not less than those required by law.

(b) <u>Hazard Insurance</u>. At all times during the Term hereof, Lessee shall, at its own cost and expense, keep:

(1) The Demised Premises insured against loss or damage by fire, lightning, windstorm, hail, explosion, riot, damage from aircraft, smoke damage, sprinkler leakage damage, war damage (when available) and such other insurance risks, casualties and hazards as are insured against by owners of comparable premises in an amount equal to one hundred percent (100%) of the replacement cost thereof (the initial replacement cost shall be $120,000.00), said replacement cost to be determined, on Lessor's request not more frequently than at annual intervals, by one or more of the insurers, or by an architect, contractor, appraiser or appraisal company selected by Lessee. * * *

(2) In addition, Lessee shall, at its own cost and expense, keep the net rental value of the Demised Premises insured against loss or damage by fire, lightning, windstorm, hail, explosion, riot, damage from aircraft, smoke damage, and such other insurance risks, casualties and hazards as are insured against by owners of comparable premises, in the amount of $22,000.00. The Lessor reserves the right, upon notice to the Lessee, to adjust the coverage amount.

All insurance to be furnished by Lessee under this paragraph shall be by policies which shall provide that the loss, if any, shall be payable to Lessee. All such insurance proceeds received by Lessee (other than rent insurance proceeds, for which provision is made in Paragraph 12(b)(2) hereof) shall be available for application to the cost of demolition, restoration, repair, replacement and rebuilding of the damage which occasioned the payment of such proceeds.

(c) <u>Indemnity Insurance</u>.  At all times during the Term hereof, Lessee shall, at its own cost and expense, provide and keep in force a policy or policies of insurance insuring Lessee against all liability of Lessee under Paragraph 13, which such policy or policies shall provide for the payment of any proceeds thereof to Lessor or Lessee as their interests may appear.

*       *       *       *       *       *       *

14.  <u>Fire and other Casualty</u>.  If any Improvement or Tangible shall be damaged or destroyed by fire or other casualty, then, irrespective of the cause, Lessee shall give prompt written notice thereof to Lessor, and shall proceed * * * to restore, repair, replace and rebuild such Improvements or Tangibles at Lessee's own cost and expense.  Such rebuilding or restoration shall be in accordance with plans and specifications submitted by Lessee to Lessor and subject to Lessor's reasonable approval and shall further be carried out by duly licensed contractors acceptable to Lessor. * * *

Rent shall not abate hereunder by reason of any damage to or destruction of the Demised Premises, and Lessee shall continue to perform and fulfill all of its obligations, covenants and agreements hereunder notwithstanding any such damage or destruction.  The foregoing notwithstanding, the obligation to continue Rent payments shall be subject to the availability to Lessee of loss of rents or business interruption insurance.  Any loss of rent insurance proceeds received by Lessee by reason of such damage or destruction shall be applied by Lessee to the payment of Rent payable by Lessee under Paragraph 3 hereof, Impositions payable by Lessee under Paragraph 6 hereof and premiums for any insurance required to be maintained by Lessee hereunder, but this shall not relieve Lessee of its obligations to pay punctually all such Rent, debt service, Impositions and insurance premiums in the event rent insurance proceeds received by Lessee are insufficient to pay the same or for any reason such rent insurance proceeds are not actually applied  by Lessee to the payment of such amounts.  If and when Lessee shall complete all demolition, restoration, repair, replacement and rebuilding which Lessee is required to carry out under this paragraph, then any balance of insurance proceeds then held by Lessee shall be retained by

Lessee free of trust.

15.  Condemnation.

(a)  Entire Condemnation.  If at any time during the Term hereof all or substantially all of the Parcel and the Improvements shall be taken in the exercise of the power of eminent domain by any sovereign, municipality or other public or private authority, then this Lease shall terminate on the date of taking of possession by such authority.  Substantially all of the Parcel and the Improvements shall be deemed to have been taken if the remaining Improvements cannot feasibly be repaired and restored so that they shall constitute a complete structural unit or units which can be operated as a day care facility on an economically feasible basis under the provisions hereof.  The award or awards for any such taking of all or substantially all of the Parcel and the Improvements shall be paid to the Lessor.

*        *        *        *        *        *        *

30.  Obligations Upon Termination.  Lessee shall, upon any termination hereof prior to the expiration of the Term, well and truly surrender and deliver up the Demised Premises into the possession and use of Lessor, without fraud or delay and in good order, condition and repair, ordinary wear and tear excepted, free and clear of all lettings and occupancies and free and clear of all encumbrances other than those existing on the date hereof and those, if any, created by Lessor without any payment or allowance whatever by Lessor.

*        *        *        *        *        *        *

36.  Governing Law.  This Lease shall be governed by and subject to the laws of the state [Ohio] in which the Facility is located.  [Reproduced literally.]

On May 15, 1997, shortly after the effective date of the April 21, 1997 lease, TMC entered into a contract (May 15, 1997 construction contract) with Stone Oak Construction, Inc. (Stone Oak Construction).  Under that contract, Stone Oak Construction

agreed to perform the following work for TMC with respect to KQC's land that TMC was leasing from KQC: (1) Install new concrete ramp at the main entrance; (2) modify the emergency exit ramp; (3) remove all existing playground equipment except for the swing set; (4) remove four feet of blacktop from the inside of existing driveway and two feet from the outside of such driveway; (5) remove debris and trees to enlarge area for bus turnaround and parking and develop area with gravel stones; (6) install chainlink fences with double gate; and (7) install chainlink fence to subdivide existing playground with two regular standard gates. In return for completing the foregoing work, TMC agreed to pay Stone Oak Construction $33,010. On a date in 1997 not disclosed by the record, Stone Oak Construction completed all of the work that it agreed to perform under the May 15, 1997 construction contract.

On August 9, 1997, TMC applied to the U.S. Department of Health and Human Services (HHS) for a grant (TMC's grant application) to make improvements to, inter alia, KQC's land and 1958 school building that TMC was leasing from KQC. TMC's grant application requested $556,500 to make certain improvements to such leased land and school building. On or about September 30, 1997, HHS approved TMC's grant application, including its request for $556,500 to make certain improvements to KQC's land and 1958 school building, and made, inter alia, a $556,500 grant to TMC

with respect to that request.

On March 4, 1998, TMC entered into two construction contracts (collectively March 4, 1998 construction contracts) with Stone Oak Construction.  Under one of those contracts, Stone Oak Construction agreed to perform the following additional work for TMC with respect to KQC's land and 1958 school building that TMC was leasing from KQC:  (1) Install child-size cabinets and sinks in six classrooms; (2) remove existing outdated windows that do not meet safety codes and replace with insulated safety glass windows; (3) install 2-inch asphalt over existing eroded parking lot surface and driveway; (4) enclose and caulk the perimeter of the foundation of the 1958 school building, using specialized engineering techniques; (5) enclose the septic tank and transformer with a fence built to certain specifications; (6) upgrade the septic system; and (7) drill a second well.  In return for completing the foregoing work, TMC agreed to pay Stone Oak Construction $262,000.

Under the second construction contract that TMC entered into with Stone Oak Construction on March 4, 1998, Stone Oak Construction agreed to construct a new building (new building) on KQC's land that TMC was leasing from KQC.  In return for completing the construction of that building, TMC agreed to pay Stone Oak Construction $398,000.

On dates in 1998 not disclosed by the record, Stone Oak

Construction completed all of the work that it agreed to perform under the two March 4, 1998 construction contracts, including construction of the new building on KQC's land.

On May 15, 1998, a document entitled "NOTICE OF FEDERAL INTEREST" (notice of Federal interest) with respect to the improved property on Maple Street was filed with the Recorder's office, Sandusky County, Ohio (Sandusky County recorder's office). As of May 12, 2005, the notice of Federal interest had not been canceled. The notice of Federal interest provided in pertinent part:

> This is to serve notice to all potential sellers,
> purchasers, transferors and recipients of a transfer of
> the real property described below as to the Federal
> government's revisionary interests as set forth in 45
> CFR Part 92, (or if appropriate, 45 CFR Part 74) which
> have arisen as a result of (Texas Migrant council, Inc.
> Ohio Region) receipt and use of Department of Health
> and Human Service's grant funds in connection with the
> purchase of said property. The property to which this
> notice is applicable is (Helena Migrant Head Start
> Center  474 Maple St.  Helena, Ohio 43435) and identi-
> fied Parcel (See Attached Legal Description)[4] in the
> books and records of Sandusky County Ohio. * * *  In
> accordance with 45 CFR 92.11 (or, if appropriate, 45
> CFR 74.134), this property may not be sold, trans-
> ferred, or its title encumbered, without approval from
> the Department of Health and Human Services. * * *
> [Reproduced literally.]

By letter dated November 8, 1999, KQC asked Richard W. Mumford (Mr. Mumford) to make a preliminary real estate appraisal

---

[4]The document "Attached Legal Description" referred to in the notice of Federal interest is a copy of the April 18, 1997 general warranty deed.

of the improved property on Maple Street that TMC was using for its Head Start activities.  Pursuant to KQC's request, Mr. Mumford sent KQC a letter dated December 17, 1999 (Mr. Mumford's December 17, 1999 letter).  In that letter, Mr. Mumford, who died before the time of the trial in these cases, stated in pertinent part:

> Following your letter of November 8, 1999 authorizing a Preliminary Real Estate Appraisal on the above property [the improved property on Maple Street], we can report the following items:
>
> > A At the time of examination and photography, no one was at the Subject.  THIS PRELIMINARY AP-PRAISAL IS FROM THE EXTERIOR ---- no entry to the INTERIOR was possible.
> >
> > B The property is owned by KQC * * *.
> >
> > D The School is at the end of Maple Street in Helena OH. * * *
> >
> > E The lot size is irregular and contains 2.0435 acres.
> >
> > F There are TWO BUILDINGS on the Property.  Both are one story in height and have no basements.
> > > Building # 1 is 72 by 162' and has 11,664 sqft.
> > > Building # 2 is 45' by 80' and has.... 3,600 sqft.
> >
> > > BOTH BUILDINGS TOTAL.............15,264 SQFT.
> >
> > G Building # 1 was built as an elementary school in 1958.  In 1994, this Building was remodeled into a Migrant Head Start School Building.  Building # 2 was built for School Uses in 1998.  BOTH Buildings are rated by FLR SABRE SYSTEMS as 100/Grade C.  Exterior of Building # 1 is brick.  Concrete block is the exterior of Building # 2.  One forced air heat and air conditioning Unit is shown in the attached photos.  Both Buildings have

Central Heat and Air Conditioning.

<u>H</u> The Building Data shows Public Water.  The School has its own private sanitary sewer system.

<u>I</u> There is 25,000 sf. of asphalt paving.  The play ground area is well fenced with chain link.  Playground equipment is in good condition.

<u>K</u> No repairs were need from AN EXTERIOR EXAMINA-TION.  No deferred maintainence was visibile on the property.  The Subject has good design and construction.

   *      *      *      *      *      *      *

The Preliminary Real Estate Assignment is in TWO PARTS:

1.  To give a Professional Opinion of current market value of BOTH Land and Improvements in their current condition.

AND

2.  To give a market value Opinion of Ground Rent IF the Improvements were to be sold.

Normal Procedure in giving an Opinion of Market Value is to utilize THREE APPROACHES to VALUE...
   • COST APPROACH
   • SALES COMPARISON APPROACH
   • INCOME APPROACH

   *      *      *      *      *      *      *

IF there are NO similar, current, proximate nor appro-priate Comparable Sales... then the substitution of the County Auditor's Public Record Values is permitted.  IF there is NO present income from the Subject Property, reliable Data from the Marketplace and the Appraiser's own files will give ranges of Rents and Expenses.  At this point, the Appraiser must use the Training, Educa-tion, Background and Experience to sort thru the Data to select and report the BEST Opinions of Rent and Expenses that better fit the Subject.

   *      *      *      *      *      *      *

Using PACENET, we have researched EVERY Comparable Sale in the Four Townships surrounding the Subject AND in the City of Fremont, for all of 1999 thru October...

WE FOUND NO SIMILAR, CURRENT, PROXIMATE OR APPROPRIATE COMPARABLE SALES TO THE SUBJECT

\*      \*      \*      \*      \*      \*      \*

COST APPROACH

From the current Marshall & Swift Cost Manual for Class C Schools of Average Construction.  The Area Multiplier is 1.02

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Base Cost=$ 72.13 sf. x 1.02 Area Multiplier= $ 73.57 sqft.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Building # 1 was built in 1958 and then remodeled in 1994.  Class C Schools with average masonry construction have an expected Building Life of 45 years.  The EFFECTIVE AGE of Building # 1 is 10 years.  Physical Depreciation for this Building is 20% using the AGE/LIFE/CONDITION METHOD

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

COST BREAKDOWN FOR BUILDING # 1
11.664 sf. @ $ 73.57 sf. LESS 0% Depreciation= $ 686,500

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Building # 2 was built in 1998 and has ZERO% Physical Depreciation[.]  The expected Building Life of a Class C, average construction masonry School is 45 years. Building # 2 has an EFFECTIVE AGE of 1 year

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

COST BREAKDOWN FOR BUILDING # 2
3.600 sf. @ $ 73.57 sf. LESS 0% Depreciation= $ 263,500

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ZERO % Functional and External Depreciation-BOTH BLDGS
TOTAL DEPRECIATED VALUES--BOTH # 1 & #2= $ 950,000 PLUS
depreciated values for the Storage Shed, Chain Link
Fence and Sanitary Sewer System - $ 40,000
IMPROVEMENT COSTS...$ 990,000 LAND...2.0435 ACRES...
$ 35,000 (2.0435 acres @ $17,000 acre)

TOTAL COST OPINION OF VALUE-$1,025,000

*       *       *       *       *       *       *

PUBLIC RECORD VALUES

From the Sandusky County Auditor's Office in Fremont[,]
OH-December 1999[.]  AUDITOR'S TRUE VALUES of the
Subject BUILDING # 1 built in 1958 and remodeled in
1994.  AUDITOR'S COST NEW @ $ 34.74 sf. 11,664 sf. LESS
82% Physical Depreciation= $ 73,000 ($ 405,000 less
82%)

*************************************************

AUDITOR'S TRUE VALUES of the Subject BUILDING # 2 built
in 1998.  3,600 sf. @ 38.86 sf. LESS 5% Physical Depre-
ciation= $ 139,900 ($ 140,000 less $ 7000)

*************************************************

AUDITOR'S TRUE VALUES of the Subject Driveways and
Parking Areas 25,000 sf. @ $1.50 sf. LESS 13% Physical
Depreciation= $ 32,500

*************************************************

NOTE:  The Storage Shed with 120 sf. and the private
Sanitary Sewer System were NOT INCLUDED in the AUDI-
TOR'S TRUE VALUES

*************************************************

IMPROVEMENT TRUE VALUES= $ 245,400

*************************************************

AUDITOR'S TRUE VALUES of Subject LAND of 2.0435 acres
$ 30,000 or $ 14,680 per Acre
TOTAL IMPROVEMENTS and LAND $ 275,000

\* \* \* \* \* \* \*

## INCOME APPROACH

\* \* \* \* \* \* \*

IF there is no VERIFIABLE RENTAL DATA we can NOT USE the INCOME APPROACH

Because we found NO RENTAL DATA for SCHOOLS in Sandusky County...

We were NOT ABLE to DEVELOP The INCOME APPROACH OPINION

\* \* \* \* \* \* \*

## GROUND LEASE
## APPROACH OPINION

The SECOND PART of the original Preliminary Appraisal Assignment is to PROJECT a valid Ground Lease Rent in the Event that the Owners would SELL the Improvements and RETAIN the Land.
### WORD OF CAUTION
IF the Improvement Sale is desired, the area of Liability Insurance could be a problem.  We found NO local Agent that sells a Liability Policy for a School to the Owners of the LAND ONLY !  They all require that the IMPROVEMENT BUYER  secure the Liability Insurance with the LAND OWNER being included as an ADDITIONAL INSURED PARTY.This would be an important question to raise with your present Insurance Agent.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### LAND VALUE from the COST APPROACH is
### $ 35,000 or $17,000 per acre

The goal of a Reasonable Ground Lease Program is to select Rates that will give a Return on the Investment and a Return of the Capital Value over a fixed period of time.  To develop a Reasonable Rate per year to accomplish these Two Goals, the Built Up Rate Method is the most feasible one for the Subject Land.This Method uses a SAFE Rate, a RISK Rate, an INFLATION Rate, a LAND TAX Land Tax Rate, and a RETURN OF CAPITAL INVESTED Rate over a 20 year period.
### Projected Built-Up Rate:

- SAFE RATE is the Passbook Savings rate ...  3%/year
- RISK RATE for land under a School .......  3%/year
- INFLATION RATE averages ................  3%/year
- LAND TAXES ............................  1%/YEAR
- HOLDING PERIOD for Land--20 years .......  5%/year

                        BUILT-UP RATE ........... 15%/year

PRESENT LAND VALUE @$ 35,000 @ 15% /year = $ 5,250/
year OR $ 437.50/month Projected GROUND LEASE RENT

  *       *       *       *       *       *       *

RECONCILIATION of the Various Approaches to Value

   - COST OPINION... $ 1,025,000

   - PUBLIC RECORD VALUES... $ 275,000

   - SALES COMPARISON and INCOME OPINIONS CONSIDERED
   but NOT USED [ see page two and page five ]

We SELECTED as the BEST OPINION of VALUE the COST
APPROACH OPINION in the sum of $ 1,025,000

   **************************************************

The HIGHEST and BEST USE of the Subject is its PRESENT
USE

   **************************************************

•PROJECTED GROUND LEASE RENT OPINION $ 5,250 YEAR /
$ 437.50 MONTH  [Reproduced literally.]

Mr. Mumford's December 17, 1999 letter made no reference to the notice of Federal interest that on May 15, 1998, was filed with respect to the improved property on Maple Street with the Sandusky County recorder's office and did not contain the actual or expected date of a charitable contribution of all or a portion of the improved property on Maple Street that was the subject of that letter.  Nor did Mr. Mumford's December 17, 1999 letter

indicate that Mr. Mumford prepared it in order to substantiate a charitable contribution for tax purposes.

Around December 20, 1999, Mr. Kaplan contacted Betty Schadle (Ms. Schadle), who at that time was a tax principal with Ernst & Young, LLP (Ernst & Young), for tax advice regarding a proposed contribution that KQC was contemplating making to a tax-exempt organization of a building that such tax-exempt organization was leasing from KQC (leased building). Mr. Kaplan advised Ms. Schadle that the tax-exempt organization had made improvements totaling about $800,000 to the leased building[5] and that KQC had made no adjustments because of such improvements to the rent that it was charging the tax-exempt organization with respect to such building. Mr. Kaplan also informed Ms. Schadle that the improvements that the lessee made to the leased building were owned by KQC. Mr. Kaplan did not inform Ms. Schadle, and she was not otherwise aware, that, in addition to the leased building, including the improvements to that building, that KQC contemplated giving to the tax-exempt organization, there was a new building located on KQC's land that the tax-exempt organization had constructed with HHS's funds. Nor did Mr. Kaplan inform Ms. Schadle, nor was she otherwise aware, that on May 15, 1998, a notice of Federal interest with respect to the improved property

---

[5]Mr. Kaplan did not advise Ms. Schadle, and she was not otherwise aware, that the tax-exempt organization had used HHS's funds to make improvements to the leased building.

on Maple Street had been filed with the Sandusky County recorder's office.

On December 30, 1999, Ronald A. Matamoros (Mr. Matamoros) had a letter that he prepared (Mr. Matamoros's December 30, 1999 letter) hand delivered to Mr. Kaplan and faxed to Ms. Schadle. When Mr. Matamoros prepared that letter, he was not aware (1) that TMC had a new building constructed on KQC's land with HHS's grant funds and (2) that on May 15, 1998, a notice of Federal interest with respect to the improved property on Maple Street was filed with the Sandusky County recorder's office. Mr. Matamoros's December 30, 1999 letter stated in pertinent part:

> You have asked us to review the lease agreement between KQC Investors, LLC and Texas Migrant Counsel [sic], Inc. relating to a child care facility located in Helena, Ohio. Specifically, you have asked us to opine as to the ownership of the improvements located on the property.

> We understand that the tenant has made certain improvements to your property which they are presently occupying pursuant to the provisions of the lease agreement. Once those improvements were incorporated into the property, i.e., as fixtures located within the building, title to those improvements immediately vested in your company subject only to the possessory rights of the tenant under the lease agreement and provided, however, that the tenant maintains its obligations under the lease agreement in good standing.

> The provisions of the lease that support this interpretation are as follows:

> a. The description of the "Demised Premises" in paragraph 1 clearly identifies the property owned by you as "all buildings, structures, fixtures and improvements erected or located on the Parcel, or affixed thereto;"

b.    Paragraph 14 clearly provides that all insur-
ance proceeds with regard to the building and any
improvements are the property of your company;

c.    Paragraph 15(a) clearly recites that all
condemnation awards, as the result of an entire condem-
nation, are payable to your company;

d.    Paragraph 30 requires that the tenant, upon
termination of the lease, surrender the possession of
the Demised Premises, which includes all improvements.

To further support your transfer of ownership, we
understand that you are amending the lease to remove
any references to the improvements as being owned by
you.  This includes the reduction of the rent amount to
an amount related solely to the value of the land and
also adjusts each of the items set out in paragraphs
(a) through (d) above.

Based on this analysis, it is our opinion that
your company could transfer ownership, by way of a bill
of sale, of all the improvements to the tenant notwith-
standing the fact that the lease term continues.

On December 31, 1999, Mr. Kaplan on behalf of KQC and Oscar

Villarreal (Mr. Villarreal) on behalf of TMC executed a document

entitled "BILL OF SALE" (bill of sale) that Mr. Matamoros had

prepared for KQC.  When Mr. Matamoros prepared that document for

KQC, he was not aware (1) that TMC had a new building constructed

on KQC's land with HHS's grant funds and (2) that on May 15,

1998, a notice of Federal interest with respect to the improved

property on Maple Street was filed with the Sandusky County

recorder's office.  The bill of sale provided in pertinent part:

Donor [KQC] is the Lessor under a Lease Agreement
dated April <u>21</u>, 1997, with Donee [TMC], as Lessee (the
"Lease").  Donor has agreed to transfer and assign all
of its rights, title and interest in and to the Im-
provements (as defined in the Lease) to the Donee as a

charitable contribution and the Donor and Donee shall, simultaneously with the execution of this Bill of Sale, modify and amend the Lease to reflect said charitable contribution.

KNOW ALL MEN BY THESE PRESENTS, that for consideration of $1.00 received from Donee, the receipt and sufficiency of which are hereby acknowledged, Donor does hereby donate, convey, set over, assign, transfer and deliver to Donee, its successors and assigns, with effect as of the date hereof, all of Donor's right, title and interest in and to the Improvements.

TO HAVE AND TO HOLD any and all of the Improvements hereby donated, conveyed, set over, assigned, transferred and delivered to Donee, its successors and assigns, for its and their own use and benefit forever. The Donor hereby warrants to the Donee that the Donor is the lawful owner of the Improvements, that the Improvements are free and clear of all liens and that the Donor has the right to donate the Improvements.

From time to time after the Closing, Donor shall execute and deliver all such other instruments and shall take all such other action as Donee may reasonably request to more effectively transfer to and vest in Donee, and to put Donee in possession of, any of the Improvements.

This Bill of Sale shall be governed by, and construed in accordance with, the laws of the State of Ohio, without regard to the conflicts of laws and rules of such state.

Mr. Kaplan did not acknowledge his signing the bill of sale on behalf of KQC in the presence of two witnesses.[6] Nor did Mr. Kaplan acknowledge his signing the bill of sale on behalf of KQC before a judge of a court of record in Ohio or a clerk thereof, a county auditor, a county engineer, a notary public, a mayor, or

---

[6]As a result, there were not two witnesses who attested to Mr. Kaplan's signing the bill of sale on behalf of KQC and who subscribed their names to such attestation.

county court judge.[7]  It was not until March 27, 2000, that KQC

gave TMC the bill of sale.

On December 31, 1999, Mr. Kaplan on behalf of KQC and Mr.

Villarreal on behalf of TMC executed an amendment to the April

21, 1997 lease (lease amendment).  The lease amendment provided

in pertinent part:

> WHEREAS, Lessor [KQC] and Lessee [TMC] did enter into a lease agreement dated the 21 day of April, 1997 [April 21, 1997 lease] (hereinafter referred to as the "Lease") relating to a child care facility located in Helena, Ohio (the "Project"); and
>
> WHEREAS, simultaneously with the execution of this Lease Amendment, the Lessor has conveyed all of its rights, title and interest in and to the building and all other improvements relating thereto which comprises the Project; and
>
> WHEREAS, the parties are desirous of modifying and amending the Lease to reflect the transfer of the ownership of the improvements from Lessor to Lessee.
>
> NOW, THEREFORE, in consideration of the mutual covenants and conditions, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do agree as follows:
>
> 1. Paragraph 1 of the Lease is hereby modified and amended to reflect that the Demised Premises now shall include only the land upon which the building and Improvements are located.
>
> 2. The rent is hereby reduced to $437.50 per month.

---

[7]As a result, there was no such person who certified Mr. Kaplan's acknowledgment of his signing the bill of sale on behalf of KQC and who subscribed such person's name to a certificate of such acknowledgment.

\*        \*        \*        \*        \*        \*        \*

4.   Any and all other provisions of the Lease
     which reflect any rights of ownership of
     Lessor in the Improvements shall be deemed
     hereby deleted.  It is the intent of the
     parties to revise the Lease to reflect solely
     the ownership by the Lessor of the land.

5.   Except as hereinabove modified, the Lease
     remains in full force and effect.

An Ernst & Young memorandum dated January 11, 2000 that was prepared under Ms. Schadle's supervision stated in pertinent part:

FACTS
The Transaction
KQC Investors, Inc. ("KQC"), a North Carolina limited liability company, is owned by Hal Kaplan, Dean Caldwell and Matthew Marceron.  KQC purchased a child care facility located in Helena, Ohio.  In April of 1997, KQC entered into an operating lease with Texas Migrant Counsel [sic], Inc. ("Texas") [TMC] relating to said facility.  Texas qualifies as an exempt organization under IRS §501(c)(3).

KQC's cost basis in the facility is approximately $125,000.  Since April of 1997, Texas has made substantial leasehold improvements to the facility.  KQC estimates that Texas spent approximately $800,000 on these improvements.  After the improvements were completed, the building was appraised at a value of $1,000,000.  No depreciation was taken on these leasehold improvements by either KQC or Texas, nor were the leasehold improvements ever carried on the books of KQC.

On December 31, 1999, KQC and Texas entered into an agreement whereby KQC agreed to transfer and assign all of its rights, title and interest in and to the building (including the leasehold improvements) to Texas as a charitable contribution.  The owners of KQC intend to take a charitable contribution deduction for the full fair market value of this property.

The Opinion Letter
Blanco, Tackabery, Combs & Matamoros, P.A., Kaplan's law firm, has provided an opinion letter stating that various parts of the lease agreement indicate that title to the leasehold improvements immediately vested with KQC and that Texas had only possessory rights subject to the lease agreement. According to this letter, the following are specific provisions of the lease that support this interpretation:

- In the event of an entire condemnation, the award for any such taking shall be paid to the Lessor;

- Property owned by KQC is identified to include "improvements erected or located on the Parcel, or affixed thereto";

- All insurance proceeds with regard to the building and improvements are the property of KQC;

- Texas is required, upon termination of the lease, to surrender the possession of the premises, which includes all improvements.

The Lease
The Lease Agreement contains no specific mention of conveying the title to the improvements. See the Lease Agreement, dated April 1997, for specific lease terms and conditions negotiated between Texas and KQC.

ISSUES
Were the leasehold improvements made by Texas the property of KQC prior to the termination of the lease, thereby entitling KQC to a charitable contribution deduction under IRC §170(b)(1)(C) equal to the fair market value of the renovated property?

CONCLUSION
There is exposure in taking the position that once the improvements to the property were made [by TMC], title to such improvements vested immediately with KQC. Due to the substantial dollar amount involved, the IRS is likely to question the ownership of the improvements located on the property. Based on previous determinations made in this area, it is very likely that the IRS will take the position that these improvements should

not be considered the property of KQC while the lease was still in effect. Accordingly, KQC's deduction may be limited to the fair market value of the property at the time of the donation excluding the renovations made by Texas.

DISCUSSION AND ANALYSIS

The predominant issue is that of establishing ownership of the leasehold improvements at the time of transfer. There are two positions on this: a) the leasehold improvements immediately vested in KQC when made, subject only to the possessory rights of Texas under the lease agreement or b) the leasehold improvements do not become the property of KQC until termination of the lease agreement.

  *   *   *   *   *   *   *

KQC had a basis only of approximately $125,000 in the property when they donated it to Texas. KQC made no investment in the significant improvements made by Texas and had no depreciable interest in them. Therefore, based on the numerous case law and opinions of the Service discussed above, significant risk ensues as to whether or not the Service will allow KQC a full fair market value charitable contribution deduction.

Lease Terms

Additionally, the specific terms of the lease should be considered in determining ownership of the leasehold improvements. As enumerated in the facts above, Kaplan's law firm has provided what they believe to be provisions of the lease agreement that support the interpretation that ownership resided with KQC. It is important to note a few facts regarding these provisions. In the event of a total condemnation, the lease agreement shall also terminate. Accordingly, ownership in the improvements may be interpreted to reside with KQC as a result of the termination of the lease rather than as a result of the condemnation. Additionally, while the lease agreement does include all improvements in the description of property owned by KQC, this same section states that KQC agrees to "let" and Texas agrees to take from KQC "said property". This statement therefore does not clearly indicate ownership of leasehold improvements made <u>during</u> the term of the lease agreement. * * * The last provision provided by

the attorneys involves the requirement that Texas surrender the possession of all improvements upon termination of the lease.  This seems to be an indication that the improvements are presently the property of Texas while the lease agreement is still in effect, rather than an indication that they are not.

It should be further noted that Section 14, Fire and Casualty, of the lease agreement between Texas and KQC states the following:

> If and when Lessee shall complete all demolition, restoration, repair, replacement and rebuilding which Lessee is required to carry out under this paragraph, then any balance of insurance proceeds then held by Lessee shall be retained by Lessee free of trust.

Where the lessee is able to keep insurance proceeds in excess of required replacements, there is an indication that ownership of land and improvements reside with the lessee during the lease term.

During the period January through March 2000, TMC paid $1,600 a month rent to KQC (or a total of $4,800), which was the amount of monthly rent that TMC was required to pay to KQC under the April 21, 1997 lease.  In April 2000, KQC refunded such monthly rent (or a total of $4,800) to TMC and sent it an invoice for each of the months January, February, and March 2000 that showed monthly rent due of $437.50, which TMC paid.  Thereafter, through March 2001, TMC paid rent to KQC of $437.50 a month.

On June 29, 2000, KQC timely filed Form 1065, U.S. Partnership Return of Income, for 1999 (KQC's 1999 return).  George S. Tutor (Mr. Tutor), who was a tax manager with Ernst & Young in 2000 when KQC's 1999 return was being prepared, signed that return as return preparer.  Mr. Tutor supervised David Johnston

(Mr. Johnston), who was a tax specialist with Ernst & Young in 2000 when KQC's 1999 return was being prepared and who prepared KQC's 1999 return on the basis of information provided to him by KQC. Mr. Tutor, inter alia, reviewed KQC's 1999 return and satisfied himself that he was able to sign that return as return preparer.

During the course of preparing KQC's 1999 return, Mr. Johnston had discussions with Mr. Marceron about KQC's claimed noncash charitable contribution to TMC. In those discussions, Mr. Marceron informed Mr. Johnston that KQC had contributed to TMC, a nonprofit organization, a building located on the improved property on Maple Street, which had a cost basis of $95,000 on KQC's books and an appraised value of $1 million. Mr. Marceron explained to Mr. Johnston that the value of the building that KQC claimed to have given to TMC had increased to $1 million because TMC made improvements to that building. In the discussions that Mr. Johnston had with Mr. Marceron about KQC's claimed noncash charitable contribution to TMC, Mr. Marceron indicated that he believed that claiming a deduction with respect to such claimed charitable contribution would be a "push"; that is to say, Mr. Marceron believed that there was a substantial risk that respondent would disallow any such claimed deduction.

Mr. Marceron completed portions, but not all, of Form 8283, Noncash Charitable Contributions (Form 8283), with respect to the

purported contribution to TMC and sent it to Mr. Johnston for his review. Mr. Johnston reviewed Form 8283 that Mr. Marceron had prepared and informed Mr. Marceron, inter alia, that Part IV, Donee Acknowledgment (donee acknowledgment), had to be completed by TMC, the purported donee, before KQC included it, as required, with the tax return that it was filing for 1999.

KQC, and not Ernst & Young, handled the actual filing of KQC's 1999 return. In that return, KQC claimed a noncash charitable contribution of $1,025,000. In the section entitled "Deductions" in Schedule K, Partners' Shares of Income, Credits, Deductions, etc., KQC showed a charitable contribution of $1,025,000. In an explanatory statement attached to that schedule, KQC described that claimed contribution as "TEXAS MIGRANT SCHOOL PROPERTY--HELENA, OH". Form 8283 that KQC included as part of KQC's 1999 return (KQC's Form 8283) indicated that the name of the organization to which KQC claimed it gave certain noncash property was "Texas Migrant School Property" and gave the following description of the property that KQC claimed it gave to TMC: "Maple Street, Helena, Sandusky County, OH". KQC's Form 8283 indicated that the donated property was "Real Estate" and that the condition of such property was "good". KQC's Form 8283 showed the fair market value of the claimed donated property as $1,025,000.[8] In disregard of Mr. Johnston's advice that, before

---

[8]Mr. Mumford's December 17, 1999 letter indicated that a
(continued...)

KQC filed KQC's 1999 return, KQC was required to have TMC, the purported donee, complete the donee acknowledgment in KQC's Form 8283, such donee acknowledgment was left blank.[9] In addition, KQC's Form 8283 did not contain: (1) KQC's name and taxpayer identification number, (2) the date and manner of KQC's acquisition of the property purportedly contributed, and (3) the cost or other basis of the property purportedly contributed, adjusted as

---

[8](...continued)
preliminary real estate appraisal of KQC's land, the 1958 school building on that land as well as the improvements thereto made by TMC, other improvements to KQC's land made by TMC, and the new building built on that land by TMC was $1,025,000.

[9]The donee acknowledgment in Form 8283 required the following information to be provided by the charitable organization receiving the claimed noncash charitable contribution:

> This charitable organization acknowledges that it is a qualified organization under section 170(c) and that it received the donated property as described in Section B, Part I [of Form 8283], above on ▸_____
> (Date)

> Furthermore, this organization affirms that in the event it sells, exchanges, or otherwise disposes of the property described in Section B, Part I (or any portion thereof) within 2 years after the date of receipt, it will file Form 8282, Donee Information Return, with the IRS and give the donor a copy of that form. This acknowledgment does not represent agreement with the claimed fair market value

> Does the organization intend to use the property for an unrelated use? . . . . . . . . . . . . . ▸ **G** Yes **G** No

An authorized representative of the charitable organization receiving the claimed noncash charitable contribution was required (1) to provide in the donee acknowledgment in Form 8283 the name of such organization, its employer identification number, and its address and (2) to sign and date such donee acknowledgment.

provided by section 1016.

Neither Ms. Schadle, Mr. Tutor, nor Mr. Johnston was aware that TMC had constructed a new building on KQC's land with HHS's grant funds. Nor was any of them aware that KQC was reporting in KQC's 1999 return a charitable contribution in an amount equal to the preliminary real estate appraisal (i.e., $1,025,000) set forth in Mr. Mumford's December 17, 1999 letter of KQC's land, the 1958 school building on that land as well as the improvements thereto made by TMC, other improvements to KQC's land made by TMC, and the new building constructed on that land by TMC.

Mr. Kaplan and Ms. Kaplan (collectively the Kaplans), Mr. Marceron and Ms. Marceron (collectively the Marcerons), and Mr. Caldwell and Ms. Caldwell (collectively the Caldwells) timely filed their respective Forms 1040, U.S. Individual Income Tax Returns, for 1999 (petitioners' respective returns). In petitioners' respective returns, the Kaplans, the Marcerons, and the Caldwells claimed the following amounts of noncash charitable contribution deductions attributable to KQC's claiming in KQC's 1999 return a noncash charitable contribution to TMC of $1,025,000:

| Petitioners | Amount of Claimed Charitable Contribution |
|---|---|
| The Kaplans | $608,850 |
| The Marcerons | 51,250 |
| The Caldwells | 364,900 |

(We shall refer to the respective noncash charitable contribution

deductions that the Kaplans, the Marcerons, and the Caldwells claimed in petitioners' respective returns as petitioners' respective claimed noncash charitable contribution deductions.)

On or about February 8, 2001, respondent's revenue agent notified Mr. Marceron that KQC's 1999 return was under examination. Thereafter, but before March 13, 2001, KQC asked Mr. Matamoros to prepare a general warranty deed transferring the improved property on Maple Street to TMC. Mr. Matamoros prepared such a deed (KQC's deed). On March 13, 2001, Mr. Kaplan on behalf of KQC signed KQC's deed in the presence of Mr. Marceron and Mr. Matamoros and acknowledged such signing before Mr. Matamoros, a notary public. On March 22, 2001, KQC's deed was filed with the auditor of Sandusky County, Ohio. As of December 20, 2001, TMC was unaware of KQC's deed.

Mr. Marceron sent a letter to TMC dated January 8, 2002 (Mr. Marceron's January 8, 2002 letter). That letter stated in pertinent part:

> Please find enclosed our [KQC's] check #1135 in the amount of Ten Thousand Five Hundred Dollars ($10,500.00) representing overpayment of rent for the period from January 1, 2000 through December 31, 2001. A review of our records indicates that you [TMC] have continued to pay rent on the real estate, which our partnership [KQC] believed that it owned, adjacent to the property that we gifted to the Head Start Center in December 1999. It was not our intent to charge you rent on the property that we have in fact gifted to Texas Migrant Council, Inc.
>
> Also enclosed is a copy of the Deed [KQC's deed] prepared by our attorney to evidence completion of our

> intended gift. We understand you have been unable to locate a copy of this deed in your files.

Mr. Marceron enclosed with Mr. Marceron's January 8, 2002 letter (1) a $10,500 check payable to TMC and (2) a copy of KQC's deed.

Respondent issued respective notices of deficiency (notices) to the Kaplans, the Marcerons, and the Caldwells. (We shall refer to the respective notices to the Kaplans, the Marcerons, and the Caldwells as petitioners' respective notices.) In petitioners' respective notices, respondent determined, inter alia, to disallow petitioners' respective claimed noncash charitable contribution deductions. In petitioners' respective notices, respondent further determined that the Kaplans, the Marcerons, and the Caldwells are liable for the accuracy-related penalty under section 6662(a).

## OPINION

Although respondent must have commenced respondent's examination of petitioners' respective returns after July 22, 1998, petitioners in each of these cases do not address section 7491(a). On the record before us, we conclude that petitioners' burden of proof in each of these cases, see Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933), does not shift to respondent under section 7491(a) with respect to such petitioners' respective deficiencies in tax that respondent determined.[10] Moreover,

_____

[10]On the record before us, we also find that petitioners in each of these cases have failed to carry their burden of estab-
(continued...)

deductions are strictly a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to the deduction claimed.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

We turn first to the issue presented under section 170.  The parties agree that, in order to be entitled to petitioners' respective claimed noncash charitable contribution deductions, petitioners must establish, inter alia, that KQC's claimed noncash charitable contribution to TMC on December 31, 1999, of the improved property on Maple Street[11] qualifies as a charitable contribution under section 170(a).[12]  (We shall hereinafter refer to KQC's claimed noncash charitable contribution to TMC on December 31, 1999, as KQC's claimed noncash charitable contribution to TMC.)  The parties also agree that, in order for KQC's claimed noncash charitable contribution to TMC to qualify as a charitable contribution under section 170(a), the following essential elements of a valid inter vivos gift (essential ele-

---

[10](...continued)
lishing that they satisfied the applicable requirements of sec. 7491(a)(2).

[11]The improved property on Maple Street consisted of KQC's land and 1958 school building that KQC purchased in 1997 and any improvements made by TMC to that property, including the new building that TMC constructed thereon with HHS's grant funds.

[12]Sec. 170(a) generally allows a taxpayer a deduction for any charitable contribution, as defined in sec. 170(c), made during the taxable year.  Sec. 170(c) defines the term "charitable contribution" to mean a contribution or gift to or for the use of one or more specified organizations.  The parties agree that KQC is one of the organizations specified in sec. 170(c).

ments of a bona fide inter vivos gift) must be present:

> (1) a donor competent to make the gift; (2) a
> donee capable of taking the gift; (3) a clear
> and unmistakable intention on the part of the
> donor to absolutely and irrevocably divest
> himself of the title, dominion, and control
> of the subject matter of the gift, in
> praesenti; (4) the irrevocable transfer of
> the present legal title and of the dominion
> and control of the entire gift to the donee,
> so that the donor can exercise no further act
> of dominion or control over it; (5) a deliv-
> ery by the donor to the donee of the subject
> of the gift or of the most effectual means of
> commanding the dominion of it; (6) acceptance
> of the gift by the donee * * *

Guest v. Commissioner, 77 T.C. 9, 15-16 (1981) (quoting Weil v.
Commissioner, 31 B.T.A. 899, 906 (1934), affd. 82 F.2d 561 (5th
Cir. 1936)).

The parties disagree over whether all of the essential elements of a bona fide inter vivos gift were present on December 31, 1999, with respect to KQC's claimed noncash charitable contribution to TMC. According to petitioners, all of those elements were present on that date. Although respondent agrees that certain of those elements were present on December 31, 1999, respondent disagrees that all of those elements were present on that date (or at any other time in 1999).[13]

_____

[13]Respondent acknowledges, inter alia, that KQC owned and was thus competent to make a gift of KQC's land and 1958 school building. However, respondent contends that KQC did not own, and that the U.S. Government had an interest in, the new building that TMC constructed on KQC's land with HHS's grant funds. As a result, according to respondent, KQC was not competent to give the new building to TMC. Respondent also contends that in 1999:

(continued...)

On the record before us, we find that petitioners in each of these cases have failed to carry their burden of establishing that all of the essential elements of a bona fide inter vivos gift were present on December 31, 1999 (or at any other time in 1999) with respect to KQC's claimed noncash charitable contribution to TMC. We shall address only whether one of those elements was present on that date (or at any other time in 1999), viz, whether KQC made an irrevocable transfer to TMC of legal title to the improved property on Maple Street or to any portion of such property. That is because our resolution of that question is determinative of the issue under section 170 presented in these cases.

In support of their position that in 1999 KQC made an irrevocable transfer to TMC of legal title to the improved property on Maple Street or to the 1958 school building and the new building on KQC's land,[14] petitioners argue:

---

[13](...continued)
(1) Although KQC intended to make a gift to TMC, KQC did not make a gift to TMC; (2) KQC did not irrevocably transfer to TMC legal title to and control over the improved property on Maple Street or any portion of such property; (3) KQC did not deliver a gift to TMC; and (4) TMC did not accept KQC's claimed noncash charitable contribution to TMC.

[14]In KQC's 1999 return, KQC reported KQC's claimed noncash charitable contribution to TMC of the improved property on Maple Street, i.e., KQC's land and 1958 school building that KQC purchased in 1997 and any improvements made by TMC to that property, including the new building that TMC constructed with HHS's grant funds. On brief, petitioners appear to muddle their position as to what they claim KQC gave to TMC on Dec. 31, 1999.
(continued...)

KQC made an effective conveyance of its interest in the improvements on December 31, 1999, as evidenced by the bill of sale * * * and by the testimony of Mr. Kaplan * * *.  The bill of sale was executed by KQC to convey all of its rights, title and interest in and to the improvements and warrants that KQC is the lawful owner of the improvements, which are free and clear of all liens, and that KQC has the right to donate the improvements.  These steps were taken in accord with the advice and recommendation of Mr. Matamoros * * * and using the form that Mr. Matamoros had provided * * *.  The bill of sale was signed by the then President of TMC evidencing the acceptance of the contribution by TMC for the express consideration of ONE DOLLAR ($1.00) only.

The deed issued and recorded in March, 2001, merely documents the manifest intent of the parties in December, 1999.  Until this formality was completed, as between the parties, the long-standing common law rule in Ohio is that the grantee of a defective conveyance has an equitable interest that can be enforced against the grantor. * * * This substance of this rule is now exists in Ohio Revised Code § 5301.25, which permits only a bona fide purchased for value that does not have knowledge of a prior conveyance that has not been recorded to defeat such conveyance. * * *

There was a clear and unmistakable intention on the part of KQC to transfer, in praesenti, all of the title, dominion and control of the improvements to the Helena property in December 1999.  The subsequent deed to the land was executed and recorded in March 2001, relating back to the contribution on December 31, 1999. KQC has parted with all dominion and control over the property in favor of TMC.  Presuming that the bill of sale in December 1999 operates to convey only the ownership of the improvements, it is an absolute and

---

[14](...continued)
At times, petitioners appear to argue on brief that KQC gave to TMC on Dec. 31, 1999, the 1958 school building and the new building on KQC's land, but not KQC's land.  At other times, petitioners appear to argue on brief that KQC gave TMC on Dec. 31, 1999, the improved property on Maple Street.  Because petitioners' position on brief is not clear, we shall consider whether KQC made a gift to TMC on Dec. 31, 1999, of the improved property on Maple Street or any portion of such property.

complete conveyance. TMC retains no interest in the improvements. Conveyance of the improvements subject to a land lease has been recognized as a deductible charitable contribution. <u>Arbor Towers Associates, Ltd. v. Commissioner</u>, 1999 T.C.Memo 213. The substance of this gift is substantially more than the right to use the improvements rent-free. [Reproduced literally.]

Petitioners' argument fails to address the requirements of Ohio law (discussed below) that must have been satisfied in order to establish one of the essential elements of a bona fide inter vivos gift with respect to KQC's claimed noncash charitable contribution to TMC, viz, that KQC made an irrevocable transfer to TMC of <u>legal</u> title to the improved property on Maple Street or to any portion of such property. On the record before us, we reject petitioners' argument that on December 31, 1999, KQC made such an irrevocable transfer.

With respect to the bill of sale on which petitioners rely, that bill of sale purports to convey to TMC all of KQC's rights, title, and interest in and to only the "improvements" on KQC's land, and not to KQC's land itself. With respect to the "im-provements" to which the bill of sale referred, the parties dispute whether such "improvements" consisted of the 1958 school building, as respondent maintains, or both the 1958 school building and the new building that TMC constructed on KQC's land with HHS's grant funds, as petitioners maintain. We need not resolve that dispute.[15] That is because, assuming arguendo that

---

[15]We note, however, that, when Mr. Matamoros prepared the

(continued...)

the improvements to which the bill of sale referred consisted of both the 1958 school building and the new building that TMC constructed on KQC's land with HHS's grant funds, on the record before us, we find that petitioners in each of these cases have failed to carry their burden of establishing that on December 31, 1999 (or at any other time in 1999) KQC made an irrevocable transfer to TMC of legal title to either such 1958 school building or such new building. On that record, we further find that petitioners in each of these cases have failed to carry their burden of proving that on December 31, 1999 (or at any other time in 1999) KQC made an irrevocable transfer to TMC of legal title to KQC's land or to the improved property on Maple Street.[16]

The parties agree that we must look to the law of the State of Ohio (Ohio law) in order to determine whether on December 31, 1999 (or at any other time in 1999) KQC made an irrevocable

---

[15](...continued)
bill of sale for KQC, he was not aware that TMC had constructed a new building on KQC's land with HHS's grant funds.

[16]Indeed, as petitioners acknowledge, the bill of sale on which they rely does not even purport to transfer KQC's land to TMC. Moreover, we reject petitioners' suggestion that the general warranty deed pertaining to the improved property on Maple Street that Mr. Matamoros prepared for KQC between Feb. 8 and Mar. 13, 2001, and that Mr. Kaplan executed on behalf of KQC on Mar. 13, 2001, relates back to the bill of sale that Mr. Kaplan executed on behalf of KQC on Dec. 31, 1999, thereby supporting petitioners' position that on that date KQC made an irrevocable transfer to TMC of legal title to the improved property on Maple Street or to any portion of such property. Petitioners do not cite, and we have not found, any authority supporting such a suggestion.

transfer to TMC of legal title to the improved property on Maple Street or to any portion of such property.  The Supreme Court of Ohio has held:  "Whether or not recorded, a deed in Ohio passes title upon its proper execution and delivery, so far as the grantor is able to convey it."  Wayne Bldg. & Loan Co. of Wooster v. Yarborough, 228 N.E.2d 841, 853 (Ohio 1967); see also Kniebbe v. Wade, 118 N.E.2d 833, 835 (Ohio 1954).

With respect to the requirement of "proper execution", Ohio law in effect in 1999 required that, in order for a deed of any interest in real property to be executed properly, the

> deed * * * shall be signed by the grantor * * *.  The signing shall be acknowledged by the grantor * * * in the presence of two witnesses, who shall attest the signing and subscribe their names to the attestation. The signing shall be acknowledged by the grantor * * * before a judge or clerk of a court of record in this state, or a county auditor, county engineer, notary public, or mayor, who shall certify the acknowledgment and subscribe his name to the certificate of the ac- knowledgment.

Ohio Rev. Code Ann. sec. 5301.01 (Anderson 1999).  (We shall hereinafter refer to Ohio Rev. Code Ann. sec. 5301.01 (Anderson 1999) in effect in 1999 as section 5301.01 of the Ohio Revised Code in effect in 1999.)  As pertinent here, effective February 1, 2002, there was an amendment (2002 amendment) of section 5301.01 of the Ohio Revised Code in effect in 1999, which deleted the second sentence thereof (quoted above).  If a deed[17] was

---

[17]Although KQC used a document entitled "Bill of Sale", respondent does not appear to suggest that such document may not
(continued...)

executed prior to February 1, 2002, the effective date of the 2002 amendment, and was not acknowledged in the presence of, or was not attested by, two witnesses, but was signed by the grantor and acknowledged by the grantor before a judge or clerk of a court of record in Ohio, or a county auditor, county engineer, notary public, or a mayor, who certified the acknowledgment and subscribed his or her name to the certificate of the acknowledgment, as required by section 5301.01 of the Ohio Revised Code in effect in 1999, inter alia, the instrument is deemed executed properly and is presumed to be valid unless the signature of the grantor was obtained by fraud.  Ohio Rev. Code Ann. sec. 5301.01 (LexisNexis Supp. 2005).

On the record before us, we find that the bill of sale that Mr. Kaplan executed on behalf of KQC on December 31, 1999, was not properly executed in accordance with section 5301.01 of the Ohio Revised Code in effect in 1999 and, as pertinent here, the 2002 amendment.  That is because the signing of the bill of sale by Mr. Kaplan on behalf of KQC was not acknowledged by him on behalf of KQC before a judge or clerk of a court of record in Ohio, a county auditor, county engineer, notary public, or mayor, who certified the acknowledgment and subscribed his or her name to the certificate of the acknowledgment.

---

[17](...continued)
constitute a deed for purposes of Ohio law.  Thus, we shall proceed on the assumption that such document may constitute a deed for purposes of Ohio law.

With respect to the additional requirement of Ohio law that, in order to pass title, there must be delivery of a properly executed deed, Wayne Bldg. & Loan Co. of Wooster v. Yarborough, supra, on the record before us, we find that that additional requirement was not satisfied on December 31, 1999 (or at any other time in 1999). We have found that KQC did not deliver the bill of sale to TMC until March 27, 2000.[18]

We have found on the record before us that petitioners in each of these cases have failed to carry their burden of establishing that on December 31, 1999 (or at any other time in 1999) KQC made an irrevocable transfer to TMC of legal title to the improved property on Maple Street or to any portion of such property. On that record, we further find that petitioners in each of these cases have failed to carry their burden of establishing that all of the essential elements of a bona fide inter vivos gift were present on December 31, 1999 (or at any other time in 1999) with respect to KQC's claimed noncash charitable contribution to TMC.[19]

---

[18]On brief, petitioners acknowledge that TMC did not receive the bill of sale from KQC until Mar. 27, 2000. We rejected above petitioners' suggestion that the general warranty deed pertaining to the improved property on Maple Street that Mr. Kaplan executed on behalf of KQC on Mar. 13, 2001, relates back to the bill of sale and thereby effected in 1999 an irrevocable transfer by KQC to TMC of legal title to such property or any portion of such property. See supra note 16.

[19]Consequently, we need not address whether on Dec. 31, 1999 (or at any other time in 1999) the remaining essential elements

(continued...)

Based upon our examination of the entire record before us, we find that petitioners in each of these cases have failed to carry their burden of establishing that under section 170 they are entitled for 1999 to petitioners' respective claimed noncash charitable contribution deductions or to any other deductions attributable to KQC's claimed noncash charitable contribution to TMC of the improved property on Maple Street or any portion of such property.

---

[19](...continued)
of a bona fide inter vivos gift that are in dispute were present with respect to KQC's claimed noncash charitable contribution to TMC. Nor do we have to address respondent's position that petitioners in each of these cases have failed to carry their burden of showing that they substantially complied with all of the substantiation requirements under sec. 170 and the regulations thereunder. We note, however, that Mr. Mumford's December 17, 1999 letter (1) did not contain the actual or expected date of a charitable contribution of all or a portion of the improved property on Maple Street that was the subject of that letter, (2) did not indicate that Mr. Mumford prepared it in order to substantiate a charitable contribution for tax purposes, and (3) made no reference to the notice of Federal interest that on May 15, 1998, was filed with respect to the improved property on Maple Street with the Sandusky County recorder's office. We also note (1) that KQC's Form 8283 included as part of KQC's 1999 return did not contain certain information required by that form (e.g., the date and manner of KQC's acquisition of the property purportedly contributed to TMC or the cost or other basis of such property, adjusted as provided by sec. 1016) and (2) that the donee acknowledgment in that form was not completed by TMC but was left blank. Finally, in light of our finding that petitioners have failed to carry their burden of establishing that all of the essential elements of a bona fide inter vivos gift were present on Dec. 31, 1999 (or at any other time in 1999) with respect to KQC's claimed noncash charitable contribution to TMC, we need not address the parties' dispute over the fair market value of any such claimed contribution. In this regard, we need not make any comments in addition to the comments that we made at the trial in these cases with respect to the parties' respective experts and such experts' respective reports.

We turn now to the issue presented under section 6662. Respondent determined that petitioners in each of these cases are liable for 1999 for the accuracy-related penalty under section 6662(a) because of a gross valuation misstatement under section 6662(h). In the alternative, respondent determined that petitioners are liable for 1999 for that penalty because of negligence or disregard of rules or regulations under section 6662(b)(1) or a substantial understatement of tax under section 6662(b)(2). On brief, respondent concedes that if the Court were to find that petitioners are not entitled for 1999 to the respective charitable contribution deductions that they are claiming "on the ground that KQC did not transfer property to TMC in 1999, or on the ground that KQC did not meet the substantiation requirements of I.R.C. § 170", petitioners would not be liable for the accuracy-related penalty because of a gross valuation misstatement under section 6662(h). Consequently, we consider only respondent's alternative argument that petitioners are liable for the accuracy-related penalty under section 6662(a) because of negligence or disregard of rules or regulations under section 6662(b)(1) or a substantial understatement of tax under section 6662(b)(2).

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the underpayment of tax attributable to, inter alia, a substantial understatement of tax, sec. 6662(b)(2). An

understatement is equal to the excess of the amount of tax required to be shown in the tax return over the amount of tax shown in the tax return, sec. 6662(d)(2)(A), and is substantial in the case of an individual if it exceeds the greater of 10 percent of the tax required to be shown or $5,000, sec. 6662(d)(1)(A).

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, such portion.  Sec. 6664(c)(1).  The determination of whether the taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including the taxpayer's efforts to assess such taxpayer's proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional, such as an accountant or an attorney.  Sec. 1.6664-4(b)(1), Income Tax Regs.  The determination of whether a taxpayer acted with reasonable cause and in good faith with respect to an underpayment that is related to an item reflected in the return of a passthrough entity is made on the basis of all the pertinent facts and circumstances, including the taxpayer's own actions, as well as the actions of the passthrough entity.  Sec. 1.6664-4(e), Income Tax Regs.  Reliance on the advice of a professional does not necessarily demonstrate reasonable cause and good faith unless,

under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. Sec. 1.6664-4(b)(1), Income Tax Regs. In this connection, a taxpayer must demonstrate that the taxpayer's reliance on the advice of a professional concerning substantive tax law was objectively reasonable. Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994), affg. T.C. Memo. 1993-480. In the case of claimed reliance on the accountant who prepared the taxpayer's tax return, the taxpayer must establish that correct and complete information was provided to the accountant and that the item incorrectly omitted, claimed, or reported in the return was the result of the accountant's error. See Westbrook v. Commissioner, 68 F.3d 868, 881 (5th Cir. 1995), affg. T.C. Memo. 1993-634; Weis v. Commissioner, 94 T.C. 473, 487 (1990); Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978).

Respondent has the burden of production under section 7491(c) with respect to the accuracy-related penalty under section 6662(a). To meet that burden, respondent must come forward with sufficient evidence showing that it is appropriate to impose the accuracy-related penalty. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Although respondent bears the burden of production with respect to the accuracy-related penalty at issue, respondent "need not introduce evidence regarding reasonable cause, substantial authority, or similar provisions. * * * the taxpayer bears the burden of proof with regard to those

issues." Id.

On brief, petitioners in each of these consolidated cases indicate that they are not disputing certain determinations in petitioners' respective notices that gave rise to a portion of the respective deficiencies that respondent determined. We have sustained the remaining determinations in petitioners' respective notices that petitioners in each of these cases have contested and that gave rise in large part to the respective deficiencies that respondent determined. As a result, the deficiency determinations in petitioners' respective notices are sustained in full. On the record before us, we find that there are substantial understatements of tax in petitioners' respective returns for 1999. On that record, we find that respondent has satisfied respondent's burden of production under section 7491(c).

Petitioners argue that respondent's determinations under section 6662(a) are wrong because "KQC made a good faith and reasonable effort to obtain qualified professional advice regarding its ability to claim a tax deduction for the charitable contribution and the requirements to sustain that deduction."[20] (We shall refer to that argument as petitioners' professional advice argument.) On the record before us, we reject petitioners' professional advice argument. On that record, we find that

[20]Petitioners in each of these cases advance no argument with respect to the portions of the underpayments in petitioners' respective returns for 1999 that are attributable to determinations in the respective notices that petitioners do not dispute.

the various advisors on whom KQC claims to have relied did not have complete and accurate information with respect to KQC's claimed noncash charitable contribution to TMC. By way of illustration, when Mr. Matamoros prepared Mr. Matamoros's December 30, 1999 letter and the bill of sale that petitioners claim transferred to TMC the "improvements" on KQC's land, including the new building that TMC constructed with HHS's grant funds, he was not aware of (1) that new building[21] and (2) the notice of Federal interest that was filed on May 15, 1998, with respect to the improved property on Maple Street with the Sandusky County recorder's office.[22]

By way of further illustration that the various advisors on which KQC claims to have relied did not have complete and accurate information, representatives of Ernst & Young[23] whom KQC

---

[21]In his testimony at the trial in these cases, Mr. Matamoros expressed the view that any new building that TMC constructed on KQC's land with HHS's grant funds about which he was unaware when he prepared Mr. Matamoros's December 30, 1999 letter and the bill of sale would be owned by KQC, but only upon termination of the April 21, 1997 lease pursuant to its terms or earlier if TMC were to be in default under such lease and were to be evicted by KQC.

[22]Mr. Kaplan testified that he did not become aware until shortly before the trial in these cases that a notice of Federal interest with respect to the improved property on Maple Street had been filed with the Sandusky County recorder's office. Even if we were to accept Mr. Kaplan's testimony, such testimony does not change the fact that neither Mr. Matamoros nor Ernst & Young representatives were aware of the filing of such notice of Federal interest.

[23]Mr. Kaplan on behalf of KQC consulted Ms. Schadle, a tax
(continued...)

consulted with respect to KQC's claimed noncash charitable contribution to TMC were not aware that TMC had constructed a new building on KQC's land with HHS's grant funds.[24] Nor were such representatives aware that KQC was claiming in KQC's 1999 return a charitable contribution for the improved property on Maple Street,[25] see supra note 11, in an amount equal to the preliminary real estate appraisal (i.e., $1,025,000) set forth in Mr. Mumford's December 17, 1999 letter for such improved property. Furthermore, Ernst & Young representatives did not know that on May 15, 1998, a notice of Federal interest with respect to the

---

[23](...continued)
principal with Ernst & Young in 1999 and 2000, and Mr. Marceron on behalf of KQC consulted Mr. Johnston, a tax specialist with Ernst & Young in 2000 who prepared KQC's 1999 return on the basis of information provided to him by KQC. Although Mr. Tutor, a tax manager with Ernst & Young in 2000, signed KQC's 1999 return as return preparer, the record does not disclose that KQC representatives consulted him directly.

[24]In discussions that Mr. Johnston had with Mr. Marceron about KQC's claimed noncash charitable contribution to TMC, Mr. Marceron did not inform Mr. Johnston that TMC had constructed a new building on KQC's land with HHS's grant funds. Instead, Mr. Marceron advised Mr. Johnston that KQC had contributed to TMC a building located on the improved property on Maple Street, which had a cost basis of $95,000 on KQC's books and an appraised value of $1 million. Mr. Marceron explained to Mr. Johnston that the value of the building that KQC claimed to have given to TMC had increased to $1 million because TMC had made improvements to that building.

[25]Mr. Kaplan and Mr. Marceron informed certain Ernst & Young representatives that KQC intended to and did give to a tax-exempt organization a building located on certain land that KQC owned. They did not advise those representatives that KQC intended to and did give to a tax-exempt organization certain land that KQC owned, including all of the buildings and improvements on such land.

improved property on Maple Street had been filed with the Sandusky County recorder's office.

The record establishes that none of the advisors on whom KQC claims to have relied gave any advice regarding the noncash charitable contribution to TMC that KQC claimed in KQC's 1999 return of the improved property on Maple Street consisting of KQC's land and 1958 school building that KQC purchased in 1997 and any improvements made by TMC to that property, including the new building that TMC constructed thereon with HHS's grant funds. On the record before us, we find that petitioners have failed to carry their burden of establishing that KQC's claimed reliance on certain advisors was objectively reasonable. See Goldman v. Commissioner, 39 F.3d at 408. On that record, we further find that petitioners have failed to carry their burden of establishing that the noncash charitable contribution to TMC of the improved property on Maple Street that KQC claimed in KQC'S 1999 return and petitioners' respective claimed noncash charitable contribution deductions were the result of any error on the part of the advisors on whom KQC claims to have relied. See Westbrook v. Commissioner, 68 F.3d at 881.

Finally, in our consideration of the issue presented under section 6662, we have in mind that, in discussions that Mr. Johnston had with Mr. Marceron with respect to KQC's claimed noncash charitable contribution to TMC, Mr. Marceron indicated

that he believed that claiming a deduction with respect to such claimed charitable contribution would be a "push"; that is to say, Mr. Marceron believed that there was a substantial risk that respondent would disallow any such claimed deduction.

On the record before us, we find that petitioners in each of these cases have failed to carry their burden of establishing that there was reasonable cause for, and that they acted in good faith with respect to, any portion of the underpayments in petitioners' respective returns for 1999.

Based upon our examination of the entire record before us, we find that petitioners in each of these cases have failed to carry their burden of establishing that they are not liable for 1999 for the accuracy-related penalty under section 6662(a) because of a substantial understatement of tax under sec. 6662(b)(2).[26]

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

---

[26]In light of our finding under sec. 6662(a) and (b)(2), we need not address respondent's argument that petitioners in each of these cases are liable for 1999 for the accuracy-related penalty under sec. 6662(a) because of negligence or disregard of rules or regulations under sec. 6662(b)(1).

To reflect the foregoing and the concessions of the parties,

<u>Decisions will be entered for respondent with respect to petitioners' respective deficiencies and the respective accuracy-related penalties under section 6662(a) and (b)(2)</u>.