T.C. Memo. 2012-163

UNITED STATES TAX COURT

STEVEN ROTHMAN AND RORY ROTHMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17547-10.                    Filed June 11, 2012.

<u>Frank Agostino</u>, <u>Reuben G. Muller</u>, <u>Eduardo S. Chung</u>, <u>Lawrence M. Brody</u>,
and <u>Jairo G. Cano</u>, for petitioners.

<u>Marissa J. Savit</u>, <u>Peggy Gartenbaum</u>, and <u>Nancy J. Lee</u>, for respondent.

MEMORANDUM OPINION

LARO, <u>Judge</u>:  During 2004 petitioners contributed a historic preservation

facade easement (easement) on their residence in Brooklyn, New York (Brooklyn).

In respect thereof, petitioners claimed a noncash charitable contribution deduction

of $247,010 on their 2004 joint Federal income tax return (2004 return) and an

excess charitable contribution carryover of $42,990 on their 2005 joint Federal

income tax return (2005 return).[1]  Respondent disallowed the deduction and the

carryover in full, determining respective deficiencies of $93,590 and $12,037 in

petitioners' 2004 and 2005 Federal income tax.  With respect to the noncash

contribution, respondent determined for 2004 and 2005 that petitioners were liable

for 40% accuracy-related penalties under section 6662(h)[2] or, alternatively, for 20%

accuracy-related penalties under section 6662(a) and (b)(1), (2), or (3).

    This case is presently before the Court on petitioners' motion for partial

summary judgment (petitioners' motion) and respondent's motion for partial

summary judgment (respondent's motion).  Each party has filed with the Court a

response to the other's motion and two supporting memorandums of law.  The

parties agree that this case is ripe for partial summary adjudication as to whether

petitioners obtained a qualified appraisal in connection with their Federal income tax

---

[1]Petitioners also claimed on the 2004 return a cash charitable contribution deduction of $28,550.  Respondent disallowed the cash contribution deduction in full and determined a 20% accuracy-related penalty with respect thereto.  Neither the deductibility of the cash contribution nor the related penalty are before the Court at this stage of the proceeding.

[2]Unless otherwise indicated, section references are to the applicable version of the Internal Revenue Code, and Rule references are to the Tax Court Rules of Practice and Procedure.  Some dollar amounts are rounded.

reporting of the noncash donation.[3]  We decide whether the appraisal attached to the 2004 return was a qualified appraisal for purposes of section 170.  We hold it was not, though we agree with petitioners, as they assert in their response, that there are material issues of fact as to whether the reasonable cause exception in section 170(f)(11)(A)(ii)(II) excuses their noncompliance.  Consequently, we shall deny petitioners' motion and we shall grant respondent's motion in that petitioners did not obtain a qualified appraisal.

## Background

We derive the facts in this background section from the parties' motion papers, the exhibits submitted therewith, and the pleadings.  Petitioners resided in New York when they petitioned the Court.

In 1998 petitioners purchased their Brooklyn residence (subject property) in fee simple.  The subject property is a four-story townhouse which at all relevant times has been used as a single-family residence and a therapy office.  The subject property is within the Brooklyn Heights Historic District (district), and it is designated by the U.S. Department of the Interior National Park Service as a

---

[3]Although we may refer to petitioners' contribution of the easement as a donation, we render no opinion as to whether the contribution was made with charitable intent and without the receipt or expectation of adequate consideration. See United States v. Am. Bar Endowment, 477 U.S. 105, 116-118 (1986).

"certified historic structure" that "contributes to the significance" of the district. CitiMortgage, Inc., and Wachovia Bank, N.A., each held a mortgage (collectively, mortgages) on the subject property at all pertinent times.

During 2004 petitioners executed a conservation deed of easement (deed of easement) granting to the National Architectural Trust (NAT) an open space and architectural facade easement on the subject property.[4] The deed of easement prohibited petitioners from altering that portion of the subject property's facade visible from the street level opposite that property without NAT's express written consent. The deed of easement was dated August 12, 2004, and petitioners' signatures were notarized on October 12, 2004. NAT's president accepted the deed of easement on NAT's behalf on October 20, 2004. The New York City Department of Finance, Office of the City Register, recorded the deed of easement on December 10, 2004.

In connection with the contribution, petitioners retained Mitchell, Maxwell & Jackson, Inc. (MMJ), a New York real estate appraisal services firm, to appraise the subject property and the easement. Alexander J. Rosado, who was licensed as a certified residential real estate appraiser by the State of New York from at least

---

[4]NAT, currently known as the Trust for Architectural Easements, was at all relevant times tax exempt under sec. 501(c) and a qualified organization under sec. 170(h)(3).

December 6, 2010, through February 16, 2012, inspected the subject property and completed the appraisal. Steven M. Knobel, who was licensed as a certified residential real estate appraiser by the State of New York State from at least December 6, 2010, through July 6, 2011, supervised the appraisal. MMJ was paid $1,000 for the services of Messrs. Rosado and Knobel.

In a uniform residential appraisal report (appraisal) dated October 4, 2004, Messrs. Rosado and Knobel estimated the market value of the subject property as $2.6 million as of September 15, 2004. The appraisal gave a legal description and address of the subject property, generally described the property's condition,[5] and attached interior and exterior pictures of the property. The appraisal identified MMJ as the company engaged to prepare the appraisal, and it named Mr. Rosado as the appraiser and Mr. Knobel as the supervisory appraiser. We hereafter refer to Mr. Rosado as the appraisal's sole author.

---

[5]The appraisal states that "The subject [property] is physically and functionally adequate 'as is'. No major repairs or modernizations are necessary. Upon inspection, the subject was found to be in very good condition overall, with a custom designed kitchen and custom designed marble/ceramic bath facilities. The subject features many 'turn of the century' details that generate strong demand for homes within the * * * [subject property's] market area."

The appraisal first used the cost and market data approaches to value the subject property without regard to the easement.[6]  An addendum to the appraisal (addendum) stated that petitioners contemplated donating a conservation easement to NAT, though the date on which the contribution was or would be made was not specified.  The addendum included a historical survey of the use and development of easements, and it generally identified elements that, according to the appraisal, negatively affected the value of eased properties.  Mr. Rosado concluded that the servitude decreased the fair market value of the subject property by approximately 11.15%, or $290,000, explaining on page 9 of the addendum:

> The purpose of this report is to estimate [the] 'as is' value of the subject property and to estimate the impact on the subject property if granted an "architectural facade easement."

> This facade easement can, and often does, have an effect on marketability and the market value of a property.  The measurement of this effect or impact is difficult to quantify with any supported precision.  Articles, periodicals, and books have been written on the subject (measurement of the value of the historic easement).  However, in this market area, there is no measure or formula that is applicable for all properties.  The individual properties are so unique that each case

---

[6]The appraisal contains contradictory statements as to whether the income approach was also employed to determine the subject property's market value without regard to the easement.  Specifically, the appraisal's final reconciliation states that all three classic approaches to value, which we understand to include the income approach, were considered in reconciling the subject property's value.  However, the appraisal states also that the income approach was not used.

must be evaluated on it's [sic] own.  Additionally, while there are
accepted methods for measuring this effect, only the market can provide the
true test.  Nonetheless, there are market measures that provide sufficient data
with which to bracket and support a reasonable market indicator.

Mr. Rosado went on to conclude on page 9 of the addendum that

> In summary, the "loss in value" is a complex issue.  While the loss may
> not be a "traditional" type of loss, the I.R.S. rules and regulations and
> the laws are clear that, preservation of historical areas are the prime
> concern.  The most significant manner to prevent builders and
> developers from destroying historic properties and/or areas is to grant
> easements, which legally prevents them from razing classic historical
> properties.  Historical cities will definitely benefit in the future as our
> defined historical areas will be preserved in perpetuity.
>
> As defined and certified by the U.S. Department of Interior, National
> Register of Historic Places and The National Architectural Trust, the
> subject property is an historic example of residential real estate located
> in an "historic" market area.  It is now generally recognized by the
> Internal Revenue Service that the donation of a facade easement of a
> property results in a loss of value ("dedicated charitable contribution")
> of between 10% and 15%.  The donation of a commercial property
> results in a loss of value of between 10% or 12% or higher if
> development rights are lost.  The inclusive data support at least these
> ranges, depending on how extensive the facade area is in relation to the
> land parcel.
>
> It is our opinion that the presence of the facade conservation easement
> would alter the market value of the subject property.  In the subject's
> market area, the appraiser cannot precisely estimate the extent to which
> this 'loss in value' will result from the facade easement due to lack of
> market data.  In this situation it is the appraiser's conclusion that the
> value of the facade conservation easement * * * on the subject property
> would be estimated at $290,000, which is approximately 11.15% of the
> fee simple value of $2,600,000.  This conclusion is based on
> consideration of range of value that the I.R.S. Has [sic] historically

found to be acceptable as well as historical precedents. Therefore, the presence of the historic facade easement would decrease the fair market value of the property rights held by the homeowner of the subject property to $2,310,000.

Petitioners filed the 2004 return on or before August 17, 2006, claiming thereon a charitable contribution deduction of $247,010 in respect of the easement contribution. Attached to the 2004 return was a copy of the appraisal and Form 8283, Noncash Charitable Contribution. Part I of section B of the Form 8283 (containing information on the donated property) described the donated property as a historical facade easement on the subject property. Part III of section B of the Form 8283 (declaration of appraiser) affirmed that Mr. Rosado holds himself out to the public as an appraiser or that he performs appraisals regularly and that he is qualified to appraise the type of property being valued. Part III also reported the date of the appraisal as September 15, 2004, even though the appraisal was dated October 4, 2004. Part IV of section B of the Form 8283 (donee acknowledgment) was signed by NAT's president and confirmed that NAT received the donated property on October 20, 2004. On the 2005 return petitioners claimed an excess charitable contribution carryover of $42,990 relating to the noncash contribution.

Respondent issued to petitioners a notice of deficiency dated May 12, 2010, determining deficiencies in, and accuracy-related penalties with respect to, their

2004 and 2005 Federal income tax. As relevant here, respondent disallowed the noncash charitable contribution deduction because, as he stated, petitioners did not establish that the requirements of section 170 (or the regulations thereunder) had been met, that the value of the easement was $290,000, or that section 170(b)(1) limited the amount of the charitable contribution deduction. Respondent also determined, with respect to the noncash contribution, that petitioners were liable for accuracy-related penalties under section 6662(h) for gross valuation misstatements, or in the alternative, that petitioners were liable for accuracy-related penalties under section 6662(a) and (b)(3) for substantial valuation misstatements, or still alternatively, that petitioners were liable for accuracy-related penalties under section 6662(a) and (b)(1) and (2) for negligence or disregard of rules or regulations or substantial understatements of income tax. Petitioners petitioned the Court in response to the notice of deficiency.

Discussion

## I. Standard of Review

The Court may grant summary judgment upon all or any part of the legal issues in controversy where the record establishes that there is no genuine issue of material fact and a decision may be rendered as a matter of law. Rule 121(a) and (b). For purposes of determining which party bears the burden of proof, we treat

respondent as the moving party and petitioners as the adverse party. Classifying the parties in this manner is appropriate because the moving party bears the burden of proving that there is no genuine issue of material fact, and factual inferences are drawn most favorably to the party opposing summary judgment. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001); Dahlstrom v. Commissioner, 85 T.C. 812, 821 (1985). The parties contend, and we conclude, that there are no genuine issues of material fact as to whether the appraisal attached to the 2004 return was a qualified appraisal under section 170(f)(11) and section 1.170A-13(c)(3), Income Tax Regs.

## II.    Parties' Arguments

Petitioners move the Court for a partial summary adjudication in their favor as to whether the appraisal attached to the 2004 return was a qualified appraisal for purposes of section 170(f)(11) and section 1.170A-13(c)(3), Income Tax Regs. According to petitioners, the appraisal actually or substantially complied with the requirements of section 1.170A-13(c)(3), Income Tax Regs., or alternatively, any noncompliance (assuming it exists) should be excused on the ground of reasonable cause under section 170(f)(11)(A)(ii)(II). Respondent similarly moves for partial summary judgment that the appraisal was not qualified because, he maintains, the report failed to satisfy the requirements of section 170(f)(11), section 1.170A-

13(c)(3)(i)(A) and (B), (ii)(A), (C), (D), (F), (G), (I), (J), and (K), Income Tax

Regs., and the Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, sec.

155, 98 Stat. at 691. Respondent contends that the substantial compliance doctrine,

if applicable at all, should not be invoked to cure the appraisal's defects because

petitioners neither actually nor substantially complied with the qualified appraisal

requirements. We note that respondent does not address whether the reasonable

cause exception in section 170(f)(11)(A)(ii)(II) otherwise entitles petitioners to the

noncash charitable contribution deduction claimed.[7]

III.    Guiding Principles

Taxpayers are generally allowed a deduction for any charitable contribution

of property made during the taxable year only if the contribution is verified under

regulations prescribed by the Secretary. Sec. 170(a)(1). The amount allowed as a

deduction for a noncash contribution of property is the fair market value of the

---

[7]Respondent does not contend, and we do not conclude, that the mortgages violated the subordination requirement of sec. 1.170A-14(g)(2), Income Tax Regs. See, e.g., Mitchell v. Commissioner, 138 T.C. ___, ___ (slip op. at p. 12) (Apr. 3, 2012). Nor does respondent assert, and we decline to conclude, that the easement was not protected in perpetuity under sec. 170(h)(5)(A) and sec. 1.170A-14(g)(6)(ii), Income Tax Regs., because NAT was not guaranteed a proportionate share of future proceeds in the event of a casualty or condemnation before the mortgages were repaid. See, e.g., Kaufman v. Commissioner, 134 T.C. 182, 186-187 (2010); 1982 East, LLC v. Commissioner, T.C. Memo. 2011-84, 101 T.C.M. (CCH) 1380, 1384-1386 (2012).

contributed property measured as of the donation date. See sec. 1.170A-1(c)(1), Income Tax Regs. A deduction claimed for a noncash contribution of property valued at more than $5,000 is generally denied unless the taxpayers obtain a qualified appraisal of the donated property and attach to the return for the taxable year in which the contribution is made such information regarding the property and the appraisal as the Secretary requires. Sec. 170(f)(11)(A)(i), (C).[8] Section 170(f)(11) and section 1.170A-13(c)(2), Income Tax Regs., collectively require taxpayers claiming a noncash charitable contribution deduction of more than $5,000 to (1) obtain a qualified appraisal of the contributed property, (2) attach to the return first claiming the deduction a fully completed appraisal summary (i.e., Form 8283), and (3) maintain records containing the information required in section 1.170A-13(b)(2)(ii), Income Tax Regs.

Another relevant statutory provision is DEFRA sec. 155, through which Congress directed the Secretary to prescribe regulations requiring any individual, closely held corporation, or personal services corporation claiming a charitable contribution deduction for which the claimed value of the contributed property is

---

[8]The requirements of sec. 170(f)(11) apply to petitioners' donation of the easement to NAT because that contribution was completed after the effective date of that section; i.e., after June 3, 2004. See American Jobs Creation Act of 2004, Pub. L. No. 108-357, sec. 883(b), 118 Stat. at 1632.

more than $5,000 to obtain a qualified appraisal. Congress defined the term "qualified appraisal" to mean an appraisal prepared by a qualified appraiser that includes, among other information, (1) a description of the property appraised, (2) the fair market value of the property on the contribution date and the specific basis for valuation, (3) a statement that the appraisal was prepared for income tax purposes, (4) the qualifications of the appraiser, and (5) any additional information as the Secretary may prescribe by regulation. DEFRA sec. 155(a)(4), 98 Stat. at 692. Pursuant to his grant of authority under DEFRA, the Secretary promulgated section 1.170A-13(c), Income Tax Regs. See T.D. 8199, 1988-1 C.B. 99 (stating in the preamble that amendments to the regulations interpreting section 170 were promulgated to conform existing regulations to DEFRA sec. 155).

Regulations issued under section 170 define a qualified appraisal as an appraisal document prepared by a qualified appraiser no earlier than 60 days before the contribution date and no later than the extended due date of the return first claiming the deduction. Sec. 1.170A-13(c)(3)(i), Income Tax Regs.[9] Additionally, a qualified appraisal must include the following information:

---

[9]A qualified appraisal must also not involve an appraisal fee determined in whole or in part on a percentage of the property's appraised value. Sec. 1.170A-13(c)(3)(D), (6), Income Tax Regs.

(A) A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed;

(B) In the case of tangible property, the physical condition of the property;

(C) The date (or expected date) of contribution to the donee;

(D) The terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed, * * *

(E) The name, address, and * * * the identifying number of the qualified appraiser; and if the qualified appraiser is acting in his or her capacity as * * * an employee of any person (whether an individual, corporation, or partnerships [sic]), * * * the name, address, and taxpayer identification number * * * of * * * the person who employs or engages the qualified appraiser;

(F) The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations;

(G) A statement that the appraisal was prepared for income tax purposes;

(H) The date (or dates) on which the property was appraised;

(I) The appraised fair market value (within the meaning of § 1.170A-1(c)(2)) of the property on the date (or expected date) of contribution;

(J) The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less depreciation approach; and

(K) The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed.

Sec. 1.170A-13(c)(3)(ii), Income Tax Regs.

Petitioners frame the initial issue to be decided as whether the provisions of section 1.170A-13(c)(3), Income Tax Regs., are mandatory, requiring strict compliance, or directory, requiring substantial compliance.  That question was first answered in the context of the foregoing regulation in Bond v. Commissioner, 100 T.C. 32 (1993).  At issue in Bond was whether the taxpayers were entitled to a charitable contribution deduction for the contribution of two blimps to a charitable organization.  The Bond parties agreed upon the value of the contributed property, that a qualified appraiser completed the appraisal, and that the donee organization was qualified to receive the contribution.  The Commissioner, however, asserted that the taxpayers were not entitled to the claimed deduction because they failed to obtain and attach to their return a separate written appraisal including the reporting information specified in section 1.170A-13, Income Tax Regs.  In concluding that

the requirements of section 1.170A-13, Income Tax Regs., were directory as opposed to mandatory, we explained:

> [I]t is apparent that the essence of section 170 is to allow certain taxpayers a charitable deduction for contributions made to certain organizations. It is equally apparent that the reporting requirements of section 1.170A-13, Income Tax Regs., are helpful to respondent in the processing and auditing of returns on which charitable deductions are claimed. However, the reporting requirements do not relate to the substance or essence of whether or not a charitable contribution was actually made. We conclude, therefore, that the reporting requirements are directory and not mandatory. [Id. at 41; citations omitted].

This Court held the taxpayers had substantially complied with the requirements of section 1.170A-13, Income Tax Regs., noting that information missing from their return was promptly furnished to the Commissioner's revenue agent at or near the beginning of the audit. Since Bond, taxpayers have been generally unsuccessful in using the substantial compliance doctrine to excuse their noncompliance with the requirements under section 1.170A-13, Income Tax Regs.

For example, in Hewitt v. Commissioner, 109 T.C. 258, 263-265 (1997), aff'd without published opinion, 166 F.3d 332 (4th Cir. 1998), the Court decided whether taxpayers were entitled to charitable contribution deductions for shares of nonpublicly traded stock contributed to qualified organizations. The taxpayers in Hewitt failed to obtain a qualified appraisal before filing their returns for the years

at issue, instead determining the amounts of the charitable contribution deductions from the average per-share price of the stock traded in arm's-length transactions at approximately the same time as the contributions. We held the taxpayers were not entitled to deductions greater than those the Commissioner allowed because to hold otherwise would have created an exemption from the clear statutory and regulatory requirements that Congress did not intend. In rejecting the applicability of the substantial compliance doctrine and Bond, the Court noted that the "appraisal requirements may not be entirely procedural so as to justify the application of the substantial compliance rules under any and all circumstances." Id. at 263-264.

We have more recently limited the role of the substantial compliance doctrine as a cure-all for appraisals lacking a valuation method or specific basis for the determined value. In Scheidelman v. Commissioner, T.C. Memo. 2010-151, 100 T.C.M. (CCH) 24, 29 (2010) (quoting Friedman v. Commissioner, T.C. Memo. 2010-45, 99 T.C.M. (CCH) 1175, 1177 (2010) (alteration in original)), this Court characterized the valuation method and specific basis underlying the value as essential because "'Without any reasoned analysis, * * * [the appraiser's] report is useless.'" Similarly, in Friedberg v. Commissioner, T.C. Memo. 2011-238, 102 T.C.M. (CCH) 356, 366 (2011), we recognized that the method of valuation and

specific basis requirements in section 1.170A-13(c)(3)(ii)(J) and (K), Income Tax Regs., relate to the substance or essence of the contribution and are consequently beyond the reach of the substantial compliance doctrine.

The substantial compliance doctrine has continuing but limited application in a post-section 170(f)(11) world. This Court previously harmonized Bond and Hewitt as offering a "standard by which we can consider whether petitioners provided sufficient information to permit respondent to evaluate their reported contributions, as intended by Congress." Smith v. Commissioner, T.C. Memo. 2007-368, 94 T.C.M. (CCH) 574, 586 (2007), aff'd, 364 Fed. Appx. 317 (9th Cir. 2009). In view of cases such as Scheidelman and Friedberg, the prevailing view is that where the appraisal contained sufficient information to allow the Commissioner to evaluate the contribution and unconditionally included the valuation method and specific basis for the valuation the taxpayer's substantial compliance will adequately serve the purpose Congress intended. With these principles in mind, we turn to whether the appraisal included a method of valuation and specific basis for the determined value. We hold it did not.

IV.   Mandatory Requirements

  A.   Method of Valuation

To constitute a qualified appraisal for purposes of section 170, the appraisal must include the method of valuation employed to determine the fair market value of the contributed property, such as the income, market data, and replacement-cost-less-depreciation approaches. See sec. 1.170A-13(c)(3)(ii)(J), Income Tax Regs. Previously recognized methodologies for valuing an easement include the market-data approach,[10] see, e.g., id., and the before and after approach, see, e.g., Rolfs v. Commissioner, 135 T.C. 471, 491 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012); sec. 1.170A-14(h)(3)(i), (ii), Income Tax Regs. In substance, petitioners argue that Mr. Rosado used the before and after approach to determine the easement's value when they claim the appraisal "equates the fair market value of the easement to 'the decrease in fair market value of the [subject] property caused by the restrictions placed on the [subject] property because of the easement.'" Respondent replies that the appraisal failed to analyze the purported restrictions the servitude imposed on

---

[10]The market data approach, also known as the comparable sales approach, determines the donated easement's fair market value from a substantial record of sales of easements comparable to the donated easement (e.g., purchases pursuant to a governmental program). See sec. 1.170A-14(h)(3)(i), Income Tax Regs.

the subject property, and as a result, did not constitute a valuation method. We agree with respondent.

The before and after method approximates the easement's fair market value by measuring the difference between the fair market value of the property without regard to the easement (before value) and the fair market value of the property encumbered by the easement (after value). See sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs. In Hillborn v. Commissioner, 85 T.C. 677, 689-690 (1985), we described the methodology for computing the before and after values as follows:

> "Before" value (before value) is arrived at by first determining the highest and best use of the property in its current condition unrestricted by the easement. At this stage, the suitability of the property's current use under existing zoning and market conditions and realistic alternative uses are examined. Any suggested use higher than current use requires both "closeness in time" and "reasonable probability." Next, to the extent possible, the three commonly recognized methods of valuing property (capitalized net operating income, replacement cost, and comparable sales) are used, but are modified to take into account any peculiarities of the property which impact on the relative weight to be afforded each respective method.

> "After" value (after value) is arrived at by first determining the highest and best use of the property as encumbered by the easement. At this stage the easement's terms and covenants are examined, individually and collectively, and compared to existing zoning regulations and other controls (such as local historic preservation ordinances) to estimate whether, and the extent to which, the easement will affect current and alternate future uses of the property. Next, the above-mentioned three

approaches to valuing property are again utilized to estimate the value of the property as encumbered by the easement.

Mr. Rosado determined the before value of the subject property using the market data approach.[11] He identified five sales of similar properties and adjusted the sale price of each comparable for factors such as front and depth lot footage, view, condition, gross living area, heating and cooling components, customized kitchens and baths, and the presence of a porch, patio, deck, and/or fireplace. Mr. Rosado treated the adjusted comparable sale prices as representing a range of values for the subject property's estimated final value. In reconciling the subject property's $2.6 million indicated value, Mr. Rosado gave greater import to more recent sales, though his methodology (if any) for weighting each comparable is not explained in the appraisal.

With respect to the subject property's after value, Mr. Rosado concluded that the market data approach could not be used because sales of comparable eased properties were not available to him. Specifically, Mr. Rosado recognized that because of the lack of market data he was unable to precisely estimate the extent to which the loss in value will result from the facade easement. He went on to

---

[11]Mr. Rosado also used the cost approach to derive an indicated value of the subject property of approximately $2.5 million. We do not discuss this method because the appraisal used the market data approach to determine the subject property's before value.

provide a survey of easements and cited historical precedents such as Hillborn v. Commissioner, 85 T.C. 677, Richmond v. United States, 699 F. Supp. 578 (E.D. La. 1988), and an article prepared by an IRS employee entitled "Facade Easement Contributions", to conclude that the encumbrance reduced the subject property's before value by approximately 11.15%. He also stated that "this figure is based on the appraiser's experience as to what the internal revenue service [sic] has found acceptable (on prior appraisals)."

This Court, in Scheidelman v. Commissioner, T.C. Memo. 2010-151, was presented with an appraisal report identical in all material respects, including the typographical errors, to the one petitioners obtained.[12] The Scheidelmans donated to NAT a historic facade easement on property they owned within the Fort Greene Historic District of Brooklyn. The Scheidelmans, like petitioners, hired an MMJ appraiser to appraise their property. The appraiser in Scheidelman, similarly to Mr. Rosado, estimated the after value of the property by applying a fixed percentage of 11.33% to the property's before value and relying on the same historical precedents Mr. Rosado cited. This Court held that the Scheidelmans were not entitled to a charitable contribution deduction for the facade easement donation to NAT because

---

[12]The record includes a copy of the appraisal at issue in Scheidelman v. Commissioner, T.C. Memo. 2010-151, 100 T.C.M. (CCH) 24 (2010).

they failed to secure a qualified appraisal. In support of that holding, the Court rejected the proposition that applying a set percentage to a property's before value provided a method or specific basis for determining a property's after value. We find Scheidelman to be directly on point.

Petitioners assert that Mr. Rosado applied the before and after value method as described in Hillborn. We disagree. The appraisal does not illustrate that Mr. Rosado determined the highest and best use of the subject property encumbered by the easement. Nor does the report indicate that he examined the easement's terms and covenants to estimate whether, if at all, the easement would affect the future use of the subject property. As far as the appraisal suggests, Mr. Rosado did not use the income, cost, or replacement-cost approach to extrapolate the fair market value of the subject property as encumbered by the easement.

Applying a fixed percentage to the before value of the subject property, without explanation, does not constitute a valuation method under section 1.170A-13(c)(3), Income Tax Regs. See Scheidelman v. Commissioner, 100 T.C.M. (CCH) at 29-30; see also Evans v. Commissioner, T.C. Memo. 2010-207, 100 T.C.M. (CCH) 275, 278 n.4 (2010) (applying a fixed percentage to a property's before value without analysis linking the percentage discount to the specific property involved may not constitute a method of valuation); Nicoladis v. Commissioner,

T.C. Memo. 1988-163, 55 T.C.M. (CCH) 624, 629 (1988) (Hillborn should not be read to mean that "a general '10-percent rule' has been established with respect to facade donations"); S. Rept. No. 96-1007, at 14-15 (1980), 1980-2 C.B. 599, 606 (the before and after method "should not be applied mechanically").  Merely selecting a set percentage based upon a range of discounts that courts or the Internal Revenue Service previously did not challenge is not a method at all, but rather is conjecture lacking analysis to support the value claimed.  Accordingly, we conclude the appraisal lacked a method of valuation.

B.    Specific Basis for the Appraised Value

A qualified appraisal under section 170 must include the specific basis for the valuation.  See sec. 1.170A-13(c)(3)(ii)(K), Income Tax Regs.  We conclude the appraisal did not include a specific (if any) basis for calculating the after value.  Mr. Rosado observed that a "facade easement can, and often does, have an effect on [the] marketability and the market value of a property."  He noted "the presence of the facade conservation easement would alter the market value of the subject property."  On account of his conclusion that comparable sales of eased properties were unavailable for market data analysis, Mr. Rosado sought guidance from various court decisions, including our decision in Hillborn.  After summarizing the facts in Hillborn and acknowledging that this Court "specified the methodology to

be followed in quantifying the loss," Mr. Rosado concluded, in summary fashion, that the value of a facade easement tends to be between 11% and 11.5% of the total value of the property.

We question Mr. Rosado's reliance on Hillborn.  The Court in Hillborn stated without qualification that the easement's terms and covenants must be analyzed individually and collectively and compared to existing zoning restrictions and preservation laws to estimate the extent to which the easement affects the subject property's fair market value.  Hillborn v. Commissioner, 85 T.C. at 690.  The appraisal does not meaningfully analyze any of these factors.

In the exact words of the report in Scheidelman, the appraisal in this case states:  "For most attached row properties in New York City, where there are many municipal regulations restricting changes to properties located in historic districts, the facade easement value tends to be about 11 - 11.5% of the total value of the property.  That figure is based on the appraiser's experience as to what the internal revenue service [sic] has found acceptable (on prior appraisals)."  In Scheidelman we stated that identical language failed to explain how the specific attributes of the subject property led to the value determined in the underlying appraisal.  See Scheidelman v. Commissioner, 100 T.C.M. (CCH) at 29.  We again find Scheidelman to be directly on point.

Petitioners' claim that Mr. Rosado explained the additional restrictions on the homeowner resulting from the donation of a preservation easement is not supported by the appraisal. While the appraisal generally cites elements that may affect the value of eased properties, Mr. Rosado never expounds upon how (if at all) the factors affected the fair market value of the encumbered subject property.[13] Nor does the appraisal suggest that Mr. Rosado qualitatively analyzed the easement's terms and covenants to determine the extent to which (if at all) the encumbrance protected the subject property.

Noticeably absent from the appraisal is consideration that, irrespective of the easement, New York City law already precluded petitioners from altering the

---

[13]Page 7 of the addendum lists the following elements which, Mr. Rosado claimed, negatively affect property values of eased properties:

> - within the sales comparison approach, a loss that can be shown from sales of eased properties in comparison with comparable properties not so eased.
> - the loss of the right to develop up to the maximum density allowed under zoning codes.
> - maintenance and insurance requirements that may be in excess of properties not eased.
> - the loss that may occur if market preference changes as to exterior design, color, windows, doors, roof lines, etc.
> - The National Architectural Trust owns the rights of "prior approval" of the facade: maintenance and other restricts [sic] (signs, paint, liens, certain restrictions) of the entire exterior portion of the subject [property].

subject property unless the change was approved by the Landmarks Preservation Commission (LPC).[14] See N.Y. City Admin. Code sec. 25-305(a)(1) (2002). In deciding whether to allow such an alteration, the New York City Administrative Code requires LPC to consider whether the alteration would change, destroy or affect any exterior architectural feature of the subject property and, in the case of an improvement, whether the addition would be inharmonious with the external appearance of neighboring improvements. Id. sec. 25-306(a)(1). The appraisal does not specifically mention these restrictions or any other specific bases in support of the proffered 11.15% reduction in value factor.

Equally troubling is that Mr. Rosado apparently valued a property interest greater than the one petitioners contributed. The appraisal's addendum states that NAT "owns the rights of 'prior approval' of the facade: maintenance and other restricts [sic] (signs, paint, liens, certain restrictions) of the entire exterior portion of the subject [property]." (Emphasis added.) However, the deed of easement is clear that petitioners contributed only an easement protecting that portion of the facade visible from the street level opposite the subject property.

---

[14]LPC is a New York City agency responsible for identifying and designating New York City landmarks and historic districts. See 1982 East, LLC v. Commissioner, 101 T.C.M. (CCH) at 1381 n.5.

C.    Conclusion

We conclude the appraisal was not a qualified appraisal because it failed to include a valuation method or a specific basis for the value determined as required under section 1.170A-13(c)(3)(J) and (K), Income Tax Regs.  Assuming arguendo that the requirements of section 1.170A-13(c)(3)(ii)(J) and (K), Income Tax Regs., are discretionary as opposed to mandatory, which they are not, our result in this case would be unchanged.  We find that in addition to failing to substantially comply with the requirements of section 1.170A-13(c)(3)(J) and (K), Income Tax Regs., the appraisal had defects which lead us to conclude that the substantial compliance doctrine does not apply in this case.

V.    Directory Requirements

A.    Overview

Respondent asserts that the appraisal, in addition to not including a method of valuation or a specific basis for the valuation, fails to satisfy the requirements of section 1.170A-13(c)(3)(i)(A) and (B) and (ii)(A), (C), (D), (F), (G), and (I), Income Tax Regs.  Petitioners contend that the appraisal actually or substantially complied with each of these requirements.  The following factors inform our conclusion that the appraisal, when taken as a whole, did not actually or

substantially comply with the requirements of section 1.170A-13(c)(3), Income Tax Regs.

> B. Appraisal Made Earlier Than 60 Days Before the Contribution Date

The regulations impose a timeliness requirement that the appraisal be made no earlier than 60 days before the contribution date and no later than the extended due date of the Federal income tax return on which the deduction is first claimed. See sec. 1.170A-13(c)(3)(i)(A), Income Regs. Petitioners assert that the foregoing 60-day period is calculated by reference to the date on which petitioners delivered the deed of easement to NAT, i.e., October 20, 2004. Respondent answers that New York law regards the date of contribution as the recordation date, i.e., December 10, 2004. We agree with respondent.

Petitioners misplace reliance on the general rule that a valid inter vivos gift is complete when, in addition to meeting other requirements, a donor irrevocably transfers present legal title, dominion, and control of the entire gift to the donee. See, e.g., Kaplan v. Commissioner, T.C. Memo. 2006-16, 91 T.C.M. (CCH) 695, 706 (2006). The nature of the property rights transferred is determined under State law, and the appropriate tax treatment of those rights is determined by reference to Federal law. United States v. Nat'l Bank of Commerce, 472 U.S. 713, 722 (1985); Woods v. Commissioner, 137 T.C. 159, 162 (2011); Carpenter v. Commissioner,

T.C. Memo. 2012-1, 103 T.C.M. (CCH) 1001, 1004 (2012) (citing Estate of Lay v. Commissioner, T.C. Memo. 2011-208, 102 T.C.M. (CCH) 202 (2011)). Thus, it is New York law that governs when the easement is regarded as complete.

Under New York law, an instrument purporting to create, convey, modify, or terminate a conservation easement is not effective unless recorded. N.Y. Envtl. Conserv. Law sec. 49-0305(4) (McKinney 2008). Insofar as New York law does not regard an easement contribution as effective until the recordation date, we conclude that the contribution date for an easement on real property in New York is the recording date. To satisfy the temporal regulatory requirement, therefore, the appraisal must have been dated no earlier than the start of the 60-day period described in section 1.170A-13(c)(3)(i)(A), Income Tax Regs. (i.e., October 11, 2004), and no later than the extended due date of the 2004 return (i.e., October 15, 2005).

Petitioners rely on cases such as Manhattan Life Ins. Co. v. Cont'l Ins. Cos., 33 N.Y.2d 370, 372 (1974), and Deepwells Estates Inc. v. Inc. Vill. of Head of Harbor, 973 F. Supp. 338, 345 (E.D.N.Y. 1997), to support their position that the contribution date is the date on which they delivered the deed of easement to NAT. We find that reliance misplaced. Each case petitioners rely on addresses deeds of real property but not the distinct conservation easement permitted under New York

law.  A conservation easement may be created or conveyed only by an instrument conforming to specific statutory provisions.  See N.Y. Envtl. Conserv. Law sec. 49-0305(1) (allowing the creation or conveyance of a conservation easement). Under those provisions a conservation easement shall not be effective unless recorded.  See id.  The cases petitioners rely on do nothing to modify the statutory rule.

Whether the appraisal date is credited as being the earlier as-of date (i.e., September 15, 2004) or the later signed date (i.e., October 4, 2004), the appraisal was not made within 60 days of the contribution date.  Crediting the appraisal as being made on the as-of date of September 15, 2004, means that the appraisal was made 86 days before the recordation date.  We think the better date for computing the 60-day period in section 1.170A-13(c)(3)(i)(A), Income Tax Regs., is September 15, 2004, because Mr. Rosado inspected the subject property and determined its value as of that date.  Even if we credited the appraisal as being made on its signature date (i.e., October 4, 2004), which we do not, the appraisal was still obtained 67 days before the recording date.  Under either scenario, the appraisal was not made within 60 days of the contribution date.  Consequently, we conclude that the appraisal did not actually comply with the temporal requirement of section 1.170A-13(c)(3)(i)(A), Income Tax Regs.

In Consol. Investors Grp. v. Commissioner, T.C. Memo. 2009-290, 98

T.C.M. (CCH) 601, 614 (2009), this Court concluded that a partnership which

obtained an appraisal report three months too early nevertheless substantially

complied with the qualified appraisal regulation.  While our decision in Consol.

Investors Grp. may support petitioners' position that their timing miscalculation

should be viewed as insubstantial, we do not render an opinion on this point

because, as we conclude, their cumulative failures preclude a finding that they

obtained a qualified appraisal.  We think this result congruous because, as we

discuss infra pp. 42-43, Consol. Investors Grp. is otherwise distinguishable from the

instant case.

C.    Record Unclear as to Whether Appraisal Prepared by a Qualified
      Appraiser

Regulations require that a qualified appraisal be prepared, signed, and dated

by a qualified appraiser as defined in section 1.170A-13(c)(5), Income Tax Regs.[15]

Sec. 1.170A-13(c)(3)(i)(B), Income Tax Regs.  We are not persuaded on the record

before us that Mr. Rosado or Mr. Knobel was a qualified appraiser in 2004.  The

---

[15]While we recognize that "qualified appraiser" is now defined in sec.
170(f)(11)(E)(ii), that section was not in effect at the time petitioners filed the 2004
return.  See Pension Protection Act of 2006, Pub. L. No. 109-280, sec. 1219(c)(1),
120 Stat. at 1084 (effective for appraisals prepared with respect to returns filed after
Aug. 17, 2006).

appraisal merely lists the State certification numbers of Messrs. Rosado and Knobel. Petitioners claim that local law and Web site printouts from the State of New York Department of State Division of Licensing Services establish that Messrs. Rosado and Knobel were qualified appraisers in 2004. We disagree. The documents upon which petitioners rely merely prove that Messrs. Rosado and Knobel were licensed as certified residential real estate appraisers from at least December 6, 2010, through July 6, 2011 (in the case of Mr. Knobel), and February 16, 2012 (in the case of Mr. Rosado). Neither printout nor any other documentary evidence confirms that Messrs. Rosado and Knobel were licensed by the State of New York in 2004. As discussed below, we conclude that this issue presents genuine issues of material fact as to whether the reasonable cause exception of section 170(f)(11)(A)(ii)(II) applies.

D.    Contributed Property Not Described

The appraisal neither describes the contributed easement accurately nor in sufficient detail for a person unfamiliar with the property to ascertain whether the appraised property and the contributed property were one and the same. See sec. 1.170A-13(c)(3)(ii)(A), Income Tax Regs. Petitioners contend that the appraisal sufficiently describes the property because it states that NAT "owns the rights of 'prior approval' of the facade:  maintenance and other restricts [sic] (signs, paint,

liens, certain restrictions) of the <u>entire exterior portion</u> of the subject [property]."
(Emphasis added.) However, as discussed above, the deed of easement protected
only that portion of the subject property's facade visible from the street level
opposite that property. The appraisal's conclusion that the fair market value of the
easement petitioners donated was $290,000 is flawed in that Mr. Rosado valued a
property interest greater than that actually contributed by petitioners. In this regard,
the appraisal does not accurately describe the easement.

Respondent contends, and we agree, that the appraisal is also unclear that the
appraised property was the easement and not the subject property itself. The
appraisal cover page is misleading when it states that the appraised property is a
single family residence and office--not the easement. A letter enclosed with the
appraisal likewise states that the appraisal is intended to estimate the fee simple
property rights of the subject property--not the easement. The appraisal's first page
is also unclear when it states that there were no adverse easements observed other
than typical utilities. The first suggestion that the appraisal purports to value the
easement is the statement on the appraisal's second page that "This appraisal is
made 'as is' and is intended to estimate the impact on the subject [property] if
granted an 'architectural facade easement.'" Setting aside the inconsistencies
between the first and second pages of the appraisal, the next clue that Mr. Rosado

purported to value the easement and not the subject property is not made until the addendum.

Even assuming that the second page of the appraisal sufficiently describes the easement, which it does not, we would not conclude that the requirements of section 1.170A-13(c)(3)(ii)(A), Income Tax Regs., have been met.  The addendum states that one copy of the deed of easement is attached to the appraisal.  However, the appraisal attaches two blank, unexecuted copies of the deed of easement, one revised in March 2004 and the second revised in June 2004.  Neither deed of easement describes the contribution date, the location of the subject property, the protected facade, a legal description of the property, or information identifying the mortgages held on the subject property.  We decline to conclude that an individual unfamiliar with easements, or one familiar with easements for that matter, would have been able to determine that the appraised property was also the contributed property.

### E.    Actual or Expected Contribution Date Not Included

A qualified appraisal must include the actual or expected contribution date. See sec. 1.170A-13(c)(3)(ii)(C), Income Tax Regs.  Petitioners contend that the requirements of that section are met insofar as the addendum states that they were contemplating a donation of a conservation easement and because NAT

acknowledged the donation on October 20, 2004, as stated on the Form 8283. We disagree.

The appraisal clearly did not specify the actual or expected contribution date as required by the qualified appraisal regulation. Requiring an appraisal to include the actual or expected date of the contribution allows an individual (such as the Commissioner's revenue agent) to compare the appraisal and contribution dates for purposes of isolating fluctuations in the property's fair market value between those dates. Including a statement that petitioners are contemplating a donation does not satisfy the clear and unambiguous requirement that the appraisal include the actual or expected contribution date. We therefore conclude that the appraisal did not actually comply with section 1.170A-13(c)(3)(ii)(C), Income Tax Regs.

Petitioners' reliance on the Form 8283 as a means of curing the absence of the contribution date from their appraisal is unpersuasive. This Court, in Simmons v. Commissioner, T.C. Memo. 2009-208, 98 T.C.M. (CCH) 211, 215 (2009), aff'd, 646 F.3d 6 (D.C. Cir. 2011), concluded that an appraisal report which omitted the contribution date substantially complied with the qualified appraisal regulation because the Form 8283 specified the date on which the contributed property was received. While Simmons tends to support the position that Form 8283 might be used to cure an appraisal omitting the actual or expected contribution date, we

decline to render an opinion on this point in the light of the appraisal's collective failures. This result is appropriate because, as we discuss infra pp. 43-44, Simmons is distinguishable from this case. We add that section 1.170A-13(c)(3), Income Tax Regs., focuses on whether the appraisal is qualified and not on the donee's understanding of the actual or expected contribution date. To allow NAT, as the donee, to satisfy the requirements of a qualified appraisal runs afoul of the impartiality requirements found elsewhere in the regulations. Cf. sec. 1.170A-13(c)(5)(i), Income Tax Regs. (the donee may not also be the qualified appraiser).

    F.    Terms of Agreement Not Disclosed

The appraisal does not include the terms of any agreement or understanding entered into (or expected to be entered into) between petitioners and NAT that relate to the use, sale, or other disposition of the contributed property. See sec. 1.170A-13(c)(3)(ii)(D), Income Tax Regs. The unexecuted deeds of easement attached to the appraisal are not the same as the deed of easement petitioners and NAT executed. Respondent asserts, and we agree, that those deeds of easement do not include the terms of any agreement that relates to the use, sale, or other disposition of the easement that petitioners contributed. We add that the appraisal also fails to mention the mortgages on the subject property or whether NAT's rights were affected by their existence. We conclude that petitioners neither actually nor

substantially complied with the requirements of section 1.170A-13(c)(3)(ii)(D), Income Tax Regs.

G.     Appraisers' Background, Experience, and Other Relevant Information Not Included

The appraisal does not describe Mr. Rosado's or Mr. Knobel's background, experience, education, and membership (if any) in professional appraisal associations as required by section 1.170A-13(c)(3)(ii)(F), Income Tax Regs.  As discussed above, petitioners assert that local law and printouts from the State of New York Department of State Division of Licensing Services Web site establish that Messrs. Rosado and Knobel were qualified appraisers in 2004.  Although we have judicially noticed local regulations concerning education and experience licensing requirements, see Evans v. Commissioner, 100 T.C.M. (CCH) at 281-282, petitioners do not ask that we do so here, see Fed. R. Evid. 201(d).  We decline to do so sua sponte.

H.     Not Clear That Appraisal Was Made for Income Tax Purposes

The appraisal does not include a specific statement, as required by section 1.170A-13(c)(3)(ii)(G), Income Tax Regs., that it was made for Federal income tax purposes.  Petitioners contend that the requirements of that section are met insofar as the appraisal states:  "If certain criteria are met, the owner [sic] may also receive

a federal income tax deduction equivalent to the value of the rights given away to a charitable, or government organization." We disagree.

Acknowledging that the appraisal was made for Federal income tax purposes is not insignificant. Such a statement serves as notice to the appraiser that he or she may be subject to a civil penalty under section 6701 for aiding and abetting an understatement of tax liability, and as a result, that appraisals he or she prepared may be disregarded pursuant to 31 U.S.C. sec. 330(c). Cf. sec. 1.170A-13(c)(5)(i), Income Tax Regs. (requiring a qualified appraiser to declare on the appraisal summary that he or she understands that intentionally false or fraudulent overstatements of the property valued may result in civil penalties and disciplinary action). An acknowledgment that petitioners may be allowed a Federal income tax deduction for their contribution fails to actually comply with the straightforward regulatory requirement. Nor does it demonstrate that the appraisers acknowledged the ramifications of overstating the easement's value. We have previously found that neglecting to include a statement that an appraisal was made for income tax purposes was an insubstantial omission in Consol. Investors Grp. v. Commissioner, 98 T.C.M. (CCH) at 614, and Simmons v. Commissioner, 98 T.C.M. (CCH) at 215. Even if we viewed petitioners' omission as inconsequential, which we do not, the

appraisal would still not be a qualified appraisal because the report's cumulative failures preclude such a finding.

I.      Wrong Measure of Value

A qualified appraisal must include "The appraised fair market value (within the meaning of § 1.170A-1(c)(2)) of the property on the date (or expected date) of contribution."  Sec. 1.170A-13(c)(3)(ii)(I), Income Tax Regs. (emphasis added).  In turn, section 1.170A-1(c)(2), Income Tax Regs., specifies that fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."  The regulatory definition of fair market value is the same measure of value adopted by the Supreme Court and this Court. See, e.g., United States v. Cartwright, 411 U.S. 546, 551 (1973); Bank One Corp. v. Commissioner, 120 T.C. 174, 304-306 (2003), aff'd in part, vacated in part and remanded sub nom. J.P. Morgan Chase & Co. v. Commissioner, 458 F.3d 564 (7th Cir. 2006).

In adopting market value and not fair market value as its measure of value, the appraisal applies the wrong standard of value.[16]  The appraisal defines the term

---

[16]The appraisal uses market value and fair market value interchangeably.  We conclude the appraisal adopted market value and not fair market value as its

(continued...)

"market value" consistent with the Uniform Standards of Professional Appraisal

Practice (USPAP) as follows:

> The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [Fn. ref. omitted].

We observed in DiDonato v. Commissioner, T.C. Memo. 2011-153, 101 T.C.M.

(CCH) 1739, 1741 n.8 (2011), and we note again here, that although market value

adopts selective elements of fair market value, the two are not identical. Compare

sec. 1.170A-1(c)(2), Income Tax Regs. (defining fair market value), with USPAP

Advisory Opinion 22 (2008) (defining market value). In using the wrong standard

of value, the appraisal fails to actually or substantially comply with the clear and

unambiguous requirement of section 1.170A-13(c)(3)(ii)(I), Income Tax Regs.

---

[16](...continued)
measure of value because the appraisal's enclosure letter stated that "the estimated market value of the [subject] property as of September 15, 2004 is: $2,600,000."

J.    Additional Substantial Compliance Considerations

Petitioners misplace reliance on cases such as Bond v. Commissioner, 100 T.C. 32 (1993), Evans v. Commissioner, T.C. Memo. 2010-207, 100 T.C.M. (CCH) 275 (2010), Consol. Investors Grp., T.C. Memo. 2009-290, 98 T.C.M. (CCH) 601 (2009), and Simmons v. Commissioner, T.C. Memo. 2009-208, 98 T.C.M. (CCH) 211 (2009), to support their position that they should prevail on substantial compliance grounds.  At the outset, it is worth noting that these cases were each decided before our decision in Friedberg v. Commissioner, T.C. Memo. 2011-238, 102 T.C.M. (CCH) 356 (2011), in which we concluded that the method of valuation and specific basis requirements related to the substance or essence of the contribution, thereby making the substantial compliance doctrine defenseless to cure defects related to those requirements.

Bond and Consol. Investors Grp. are distinguishable from the instant case in that petitioners, unlike the taxpayers in those cases, did not provide to respondent the information required in the regulations at any time.  See Bond v. Commissioner, 100 T.C. at 34-35, 42; Consol. Investors Grp. v. Commissioner, 98 T.C.M. (CCH) at 614.  By curing the defects in their appraisals at the audit stage, the taxpayers in Bond and Consol. Investors Grp. complied with the principal objective of DEFRA sec. 155 though they did not meet the literal requirements of the regulations

interpreting that law.  Cf. Hewitt v. Commissioner, 109 T.C. at 265 (the principal

objective of section 155 is to provide a mechanism whereby the Commissioner

would obtain sufficient return information in support of the claimed valuation of

charitable contributions of property).

In Evans v. Commissioner, 100 T.C.M. (CCH) at 279, we stated that "any

encumbrance on real property, howsoever slight, would tend to have some negative

effect on that property's fair market value."  We noted further, however, that

taxpayers must produce sufficient credible evidence in respect of the easement's fair

market value to fix their entitlement to a charitable contribution deduction.  Nothing

in Evans suggests that an appraiser need not rely on a method of valuation to

buttress his or her conclusion that an easement affects the property's fair market

value.  To the contrary, we cautioned that applying a fixed discount of a property's

before-donation market value without any analysis tying the percentage discount to

the specific property involved may not constitute a before-and-after valuation under

the regulations.  Id. at 278 n.4.  Thus, we read Evans as bolstering respondent's

position, not weakening it.

In Simmons v. Commissioner, 98 T.C.M. (CCH) at 215-216, this Court found

that the appraisal at issue was qualified because, in addition to other reasons, the

appraiser took into account statistics gathered by the donee organization and the

appraisal identified the method of valuation used and the basis for the valuations reached. The appraisal in this case does not contain a statistical analysis, a valuation method, or a specific basis for the valuation. We thus find the instant case distinguishable from Simmons and consider Scheidelman directly on point.

K.    Conclusion

On the basis of the foregoing, we conclude that the appraisal neither actually nor substantially complied with the requirements of section 1.170A-13(c)(3), Income Tax Regs. We are mindful that the appraisal met some of the requirements in section 170(f)(11) and section 1.170A-13(c)(3), Income Tax Regs. Specifically, the appraisal did not involve a prohibited appraisal fee based upon a percentage (or set of percentages) of the subject property's appraised value. See sec. 1.170A-13(c)(3)(i)(D), (6), Income Tax Regs. The appraisal also listed the name, business address, and State certification numbers of Mr. Rosado. See sec. 1.170A-13(c)(3)(ii)(E), Income Tax Regs. When viewing the multiple defects found elsewhere in the appraisal, however, we decline to conclude that the substantial compliance doctrine controls this case. It follows that the appraisal petitioners attached to their 2004 return was not a qualified appraisal.

VI.     Whether Reasonable Cause Excuses Petitioners' Noncompliance

We have concluded that the appraisal did not actually or substantially comply with the requirements of section 170(f)(11) and section 1.170A-13(c)(3), Income Tax Regs. Petitioners next assert that the reasonable cause exception of section 170(f)(11)(A)(ii)(II) excuses their noncompliance. Respondent does not address this point, relying instead on the general rule that taxpayers who fail to obtain a qualified appraisal are denied a deduction under section 170(f)(11)(A)(i). On the record before us, we must conclude that there are genuine issues of material fact as to whether petitioners' noncompliance should be excused on the ground of reasonable cause.

To be sure, there are factual questions surrounding whether Messrs. Rosado and Knobel were qualified appraisers when the appraisal was completed, whether petitioners provided them with necessary and accurate information, and whether petitioners reasonably believed Messrs. Rosado and Knobel to be competent advisers who had sufficient expertise to justify reliance, among others. Cf. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000) (listing factors to be evaluated when deciding whether a taxpayer relied upon a professional with reasonable cause and in good faith), aff'd, 299 F.3d 221 (3d Cir. 2002). Accordingly, respondent's motion will be granted in that petitioners did not obtain a

qualified appraisal. Whether petitioners can avail themselves of the reasonable cause exception of section 170(f)(11)(A)(ii)(II) is an issue best decided following trial.

In reaching our decision on the adequacy of the appraisal, we have considered all arguments made, and to the extent that we have not specifically addressed them, we conclude that they are irrelevant, moot, or without merit.

To give effect to the foregoing,

<u>An appropriate order will be issued denying petitioners' motion and granting respondent's motion to the extent stated herein</u>.